Madden, Judge,
delivered the opinion of the court:[1]
The plaintiff is the successor to each of the partners of the N. P. Severin Company, a partnership whose members are now deceased. The partnership, which will be called the plaintiff in this opinion, on June 22,1935, entered into a contract with the United States, which acted through the agency of the Federal Emergency Administrator of Public Works. The contract was for the construction of a low-cost community housing project at Indianapolis, Indiana, which project became known as the Lockefield Garden Apartments. The contract price was originally $2,440,921, and was later reduced by change orders to $2,311,652.22. The contract provided that the work was to be completed within 400 calendar days after the receipt by the contractor of the notice to proceed. The notice was given on July 8, 1935, which made August 10, 1936, the completion date. For late completion, not excusable under the terms of the contract, liquidated damages of $250 per day were agreed to.
The contract was completed more than a year after the originally set completion date. The delay was excused by the officials of the Government, and no liquidated damages were assessed against the plaintiff. But the plaintiff asserts in this suit that the delays were not only excusable, so far as the plaintiff was concerned, but that most of the delay was caused by conduct of the Government which constituted *634 breaches of contract on its part and thus rendered the Government liable to the plaintiff for the damages which the plaintiff suffered because of the delays.
The delays involved in this suit fall into three categories: foundation delays, leaking wall delays, and delays by the Government in accepting the project when, the plaintiff claims, it was completed.
FOUNDATION DELAYS
The work contracted for consisted of the construction of 24 buildings, 8 of which were two-story row houses, 15 were three-story apartment houses, and one was a building containing twelve stores and some office space. The site covered some 22 acres, 5 blocks long and 3 blocks wide, from which slum dwellings had been cleared. There were on the site, as both parties knew when they made the contract, old streets and sidewalks, cesspools, cisterns, foundations and basements. The first work to be done was to excavate for the basements, foundations walls, and piers for the new buildings. The general excavation was done by machines. Then, at the foot of the foundations, and at the location of the piers, deeper excavation was done by hand so that concrete footings could be poured on which the foundations and piers would rest. This excavation had to go to solid ground, in order to make the foundations safe, and, because of the old basements, cisterns and cesspools which were on the site, places were encountered in nearly all the buildings where the hand excavation had to go to considerable depths in order to reach solid ground.
The plaintiff claims that the Government should have entrusted its agents on the job with the authority to determine when excavation to additional depths was required, and when a satisfactory depth had been reached, so that the work could go forward promptly, the amount of the additional excavation could be measured, the forms could be installed, the concrete footings poured, and the foundations and piers formed and poured. But, says the plaintiff, the Government’s agents on the job were not authorized to make these decisions. They were frequently required to communicate *635 with their superiors in Washington, sending in sketches and waiting for instructions as to whether the conditions which they described were proper for construction. In the meantime, says the plaintiff, the work on the particular building Was held up, it was necessary to move men and equipment to other buildings and later bring them back, and orderly and planned progress on the job as a whole was disrupted. The Government urges that not much disruption or delay was caused by the practices of which the plaintiff complains, and that such delay as there was was unavoidable under the terms of the contract. The Government points to Drawing B-326, which was a part of the contract and which contained the following note:
All footings shall rest on original natural undisturbed bearing material which is assumed as follows: — Foot- . ings for Buildings #1 to 8, East Wing of 11 and 13, and Garages — Clay. Footings for all other buildings— Gravel. In any case where the assumed bearing material is not found at the elevations shown, or old basements are not found in the exact location indicated, or any other contingency is encountered which might affect the assumed safe bearing value of the soil, or its future integrity as such, the Contractor, before executing any Foundation work, shall notify the Contracting Officer, who will consult with the Architect and issue instructions for the necessary adjustments. All changes of level of footings shall be constructed in detail as shown on Detail No. 40.
The contracting officer was in Washington. The Government’s interest was twofold; first, to make sure that the excavation was carried to soil which was safe, and, second, to avoid unnecessary excavation because it had to pay for the excavation, and for the form work and concrete placed in it, as extras to the contract. The Government says that if submission of these problems to the contracting officer took time and delayed and disrupted the plaintiff’s work, nevertheless the plaintiff was required by the contract to endure the delay and disruption.
We think that the contracting officer, who had authority to delegate to others his functions under the contract, was required by a decent consideration for the interests of the *636 plaintiff, to authorize someone on the project to make these •decisions. The problems were not difficult and the instances were numerous. The decisions in Washington were probably made almost entirely upon the basis of recommendations from the project manager and the architect, both of whom were in Indianapolis. The advantage to the Government in insisting upon the letter of the contract was so slight in comparison with the disruption and damage which was caused to the plaintiff by that insistence, that the Government’s conduct amounted to a breach of the contract, when the contract is fairly construed. Indeed, by Change Order No. 1, issued by the contracting officer on September 25, 1935, and shown in our Finding 13, the project manager does seem to have been authorized to approve these changes in the depth or design of footings. But even after this modification of the contract, many such problems were submitted to Washington.
The extent of the delay caused by the Government’s practices in regard to footing excavations is hard to determine. We can tell when the formal notices were given, but it seems that in many cases oral authorizations to the plaintiff to proceed were given, and the plaintiff did proceed, before the formal notice was issued. Then, too, there were strikes and bad weather which interrupted progress. Our best judgment is that the project was delayed 80 days by the Government’s breaches of contract in regard to foundation changes.
LEAKING WALL DELAYS
Above the foundations, the buildings were constructed as follows. A concrete slab, resting on the foundations and piers, constituted the floor of the buildings and the ceilings of the basements. The walls of the buildings above the foundations consisted of a single outer tier of brick laid flat and horizontally to the wall, with a header line of bricks constituting every sixth row. The back of the tier of bricks was parged with mortar. Behind the tier of bricks was a back up wall of Haydite blocks, of the same dimensions as cinder or concrete blocks, the appropriate row of blocks being so shaped that the header row of bricks extended back and *637 were bonded over and to the blocks with mortar, thus tying the brick wall and the block wall together. There was no parging or waterproofing on the inside surface of the blocks, the plaster being placed directly on them. The ceiling of the first floor of the buildings, which was the floor of the second floor was another concrete slab, resting on the Haydite block walls and on interior piers or columns. The third floor of the three-story buildings was another concrete slab, as were the roofs of all the buildings.
The brick work was done by a competent subcontractor and the work was, apparently, observed by the Government inspectors as it was done. The inspectors had no serious criticism of the brick work. But some months after the walls were constructed, serious leakage through the walls appeared wherever they were exposed to rain accompanied by wind. This problem turned out to be most distressing. Both the plaintiff and the Government searched for the cause or causes of the leakage. The Government blamed the leakage on faulty flashing, inadequate pointing of brick work, failure to fill the joints in laying the bricks and failure adequately to parge the backs of the tier of bricks or slush full the joints between the bricks and the Haydite blocks. The plaintiff, after extensive repointing and completion of flashings, asserted that the leakage resulted almost entirely from faulty design of the buildings. The concrete slabs described above, which constituted the floors and roofs of the buildings, extended for the entire length and width of each building, with no joints to permit expansion or contraction. As we have said, they rested, at the perimeter of each building, on the Haydite block wall, and, inside the building, on the piers or columns. When the slabs expanded, they pushed the Haydite walls outward. Those walls were in contact with the brick walls which were, in consequence, also pushed outward. The brick walls had to give way at some point, and cracks resulted, some running in a straight course along the bricks and some running irregularly, in a jagged fashion. The mortar bond between the bricks was broken and access of water was possible. The contraction of the slabs had a similar effect, as did the lowering of the slabs where they rested on the piers, when the concrete in the *638 piers cured and contracted. We are by no means certain that the Government’s design, which resulted in the cracking of the walls, was the sole cause of the leakage, but we think that the weight of the evidence is to the effect that it was the principal cause.
The leaking walls caused serious delay and great damage to the plaintiff. The situation was so troublesome that for weeks at a time the work was practically at a standstill. If wooden floors were placed, they swelled and erupted, plaster was stained and spoiled, and hardware rusted. Our best judgment is that 42 days’ delay were caused by the leaking walls, attributable to poor design, and that the plaintiff’s work was damaged thereby.
DELAY IN ACCEPTANCE OF PROJECT
The specifications provided that when the work was practically completed the contractor was to give the contracting officer at least ten days’ notice in writing of the date on which the work would be ready for final inspection.. On July 1, 1937, the plaintiff gave notice that, unless circumstances beyond its control intervened, the project would be ready for final inspection on August 1. Before final inspection there was, apparently, so-called “punch-list” inspection. The plaintiff notified the Government’s project manager when each building was ready for that preliminary inspection, which gave the Government the opportunity to list the asserted defects in the work which the contractor was obliged to correct. The Government was unreasonably dilatory in conducting the punch-list inspections, and in submitting its lists to the plaintiff. By this time the parties were in complete disagreement as to what defects the contractor was obliged to correct. The leaking walls had caused many defects, but the plaintiff took the position that the leaking walls were the responsibility of the Government, and that, therefore, the plaintiff was not obliged to repair the damage caused by the leakage. A consequence was that the plaintiff refused to make many of the corrections called for by the punch lists, and made many other corrections under protest.
By September 1, 1937, the buildings were largely ready for occupancy except for the defects caused by the leaky *639 walls. However, there was contract work still to be done, such as patching spalled ceilings, completion of the installation of refrigerators and medicine cabinets, placing window shades, repairing sidewalks, and cleaning and testing electric ranges.
Because of the dispute as to the responsibility for the defects resulting from the leaking walls, the Government never did accept the project as completed. The plaintiff continued to protect the buildings and to demand their acceptance by the Government. On December 17, 1937, the Government, still refusing to accept the project, terminated the plaintiff’s contract and advised the plaintiff that it would cause the corrective work to be done and would charge the cost of it to the plaintiff. By later administrative proceedings, liquidated damages for delay in completion were excused, and charges against the plaintiff for the costs of completion were largely eliminated. Those items are not involved in this litigation, except in connection with the defendant’s counterclaim, which we find to be without merit.
We have concluded that the plaintiff’s work was substantially completed as of September 15, 1937, and that the Government’s delay in taking over the project as of that date was a breach of its contract.
The plaintiff’s supervisory and other expenses were increased by reason of the delays described herein. Much remedial work was performed upon the buildings to correct the water damages and cracked walls prior to the time the defendant took over the project on December 27,1937. Most of this corrective work was performed by plaintiff’s subcontractors.
The plaintiff’s cost resulting from such delays and corrective work was $55,197.38.
CLAIMS ON BEHALF OF SUBCONTRACTORS
The plaintiff has included in its suit the damages alleged to have been suffered by numerous of its subcontractors because of the three kinds of delays discussed above. In Finding 76 we have set forth the names of each of the subcontractors involved and the provision appearing in each subcontract relieving the plaintiff from any liability to the *640 subcontractor for delays caused by the Government. These exculpatory provisions are identical with the one involved in the case of Continental Illinois National Bank v. United States, 121 C. Cls. 203 (January 8, 1952), certiorari denied, 343 U. S. 963, in which it was held that when a contractor has no liability to his subcontractor for damages caused by the Government, he cannot recover from the Government damages suffered by the subcontractor. The record herein contains evidence that substantial damages were suffered by the subcontractors because of the same faults of defendant which damaged the prime contractor. (Finding 77.) However, in view of the authorities cited above, the court has not weighed the evidence as to the nature and amount of such damages nor made findings with reference thereto.
FINALITY OF ADMINISTRATIVE ACTION
The plaintiff urges that certain findings of the authorized agent of the head of the department, to the effect that the plaintiff had been damaged in the amount of $101,358.96, are binding upon this court, under Article 15 of the plaintiff’s contract. The plaintiff relies on United States v. Wunderlich, 342 U. S. 98. The General Accounting Office, though it had requested these findings from the agent of the head of the department, refused to authorize the payment of the amount, because it involved claims for unliquidated damages which had to be determined by a court.
Though we have given great weight to the findings of the agent of the head of the department, because of the care and study which he seems to have devoted to the problem, we do not think that finality attaches to his findings. The departments are authorized to spend money only for the purposes for which it is appropriated by Congress. Funds are not appropriated to pay damages for breaches of contracts. The administrative findings made for the head of the department could not therefore be followed by administrative payment of the claim. We have held that such findings, adverse to the contractor, are not binding upon this court, since it would be unreasonable to construe Article 15 to authorize administrative officers to finally decide claims against con *641 tractors which they could not effectively decide in their favor. Anthony P. Miller, Inc. v. United States, 111 C. Cls. 252, 330.
THE DEFENDANT’S COUNTERCLAIM
The Government has filed a counterclaim for the expenditures which it made in repairing the leaky walls and the consequences thereof, and for the maintenance of the buildings from the time they were taken over by the Government until they were occupied by tenants. These expenditures were not made necessary by any breach of duty on the part of the plaintiff. The counterclaim is therefore dismissed.
The opinion and findings of fact heretofore issued on July 13,1953 are vacated and withdrawn and this opinion and the following findings of fact are substituted therefor.
The plaintiff may have a judgment for $55,197.38.
It is so ordered.
Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Koald A. Hogenson, and the briefs and arguments of counsel, makes findings of fact as follows:
1. During the pertinent times hereinafter mentioned, prior to July 8,1941, Nils P. Severin and Alfred N. Severin were partners doing business as N. P. Severin Company (the contractor herein) with its principal place of business at Chicago, Illinois.
On July 8, 1941, Alfred N. Severin died, and the plaintiff bank was thereafter appointed executor of his estate by the Probate Court of Cook County, Illinois. Upon the subsequent death of Nils P. Severin, the plaintiff was duly authorized to act as liquidator of the partnership affairs and to prosecute this action.
2. On June 22, 1935, the contractor and the defendant, acting through the Federal Emergency Administrator of Public Works, entered into a contract designated as Contract No. P. W. 120.22 for construction of a low-cost com *642 munity housing project, Housing Project No. H-1601, Indianapolis, Indiana, later known as the Lockefield Garden Apartments, in consideration of the sum of $2,440,921, later adjusted by change orders to $2,311,652.22.
The contract provided that the person authorized by the Administrator to have general supervision of the work would be the contracting officer, and, on December 12, 1935, the Director of the Housing Division of the Public Works Administration advised the contractor that he had been designated as the contracting officer.
By Executive Order dated October 27, 1937, the administration of this contract was transferred to the United States Housing Authority, and the contractor was so advised November 5, 1937.
3. The contract provided that the work be completed within 400 calendar days after receipt of notice to proceed, with liquidated damages of $250 per day for delays not excusable pursuant to Article 9.
The notice to proceed established the contract performance period from July 8,1935, to August 10,1936, both dates inclusive.
4. The project was not accepted as complete, but the defendant terminated the contract and took possession December 27, 1937, assessed liquidated damages after September 15 through December 26, 1937, performed corrective work and backcharged the costs to the contractor. The duly authorized representative of the head of the department determined that contract performance was complete by September 1, 1937, set aside the liquidated damages and substantially reduced the backcharges.
The unpaid balance of the adjusted contract price was thereafter paid to the contractor, without prejudice to its claims for damages and additional costs due to delays and disruption of the work.
5. The work consisted of the construction of 24 buildings. Buildings 1 to 8 were two-story row houses, each having eight units with individual entrances. Buildings 9 to 23 were three-story apartment, houses, some with penthouses. Building 24 provided twelve stores and office space.
*643 The project site covered about 22 acres, 3 blocks wide and 5 blocks long, from which slum dwellings had been cleared. It was readily observable, before the contract was entered into, that old streets and sidewalks, cesspools, cisterns, foundations, and basements would be encountered.
The work included the furnishing and installing of plumbing and heating equipment, electric wiring, steam-pipe system, necessary fuel and water lines, and the removal of overburden and grading of the grounds, together with specified sidewalks within the property lines.
6. The type of construction was similar for all buildings. The concrete masonry, reinforced with steel, consisted of footings, foundation walls, floor and roof slabs, and interior columns. The exterior walls were comprised of a single tier of face bricks, the inside surface of which was parged with mortar, with a back-up wall of Haydite blocks, bonded by á header line of face bricks at every sixth row. The first floor slab rested on the foundation walls, and the upper floor and roof slabs on the Haydite back-up, each slab having interior column supports.
The plastering of the inside of the exterior walls was directly on the Haydite blocks, and for the inside partitions, on metal lath. The plaster finish coat, except in kitchens and bathrooms, contained added coloring in lieu of painting. The concrete floor and roof slabs formed ceilings for the apartments below, and were treated with plaster primer and one coat of cement water paint. The kitchen and bathroom walls were finished with oil paint.-
The floors were of maple wood blocks, laid in mastic directly on the floor slabs, except that kitchen flooring was linoleum cemented to the slab. On top of the roof slab of each building was placed a paper, tár, and gravel roof.
7. The buildings fell into three groups for construction purposes. The row houses, buildings 1 to 8, occupied the southern area of the project site, with buildings 9 to 18 forming a central group, and buildings 19 to 24 situated on the northern part.
As shown in its progress schedules submitted to the defendant, the contractor reasonably planned to start a build *644 ing in each group at about the same time and rotate the trades and crafts from building to building within each group. After the excavation of the basement, the sequence of operations on each building was necessarily as follows: Hand excavation, form work and concrete pour for foundation footings and walls; formwork and concrete pour for first-floor slab; the brick and block masonry work for the first story; and subsequently, the alternating of the succeeding slab work and exterior wall construction until parapet walls were erected and roofing materials installed.
During the progress of the work, the necessary sleeves, pipes, conduits, wiring and outlets for electricity, plumbing and heating would be installed. After a building was under roof, interior carpentry, flooring, painting and the remaining plumbing, heating and electrical work would be performed.
Except for the delays encountered, the contractor could reasonably have finished the work within the contract period.
8. The contract contained the following provisions:
ART. 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and (or) specifica-cations of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than $500 shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered, unless the contracting officer shall for proper cause extend such time, and if the parties cannot agree upon the adjustment the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Art. 4. Changed, conditions. — Should the contractor encounter, or the Government discover during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention *645 of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions and if he finds that they materially differ from those shown on the drawings or indicated in the specifications, he shall at once, with the written approval of the head of the department or his representative, make such changes in the drawings and (or) specifications as he may find necessary, and any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted as provided in article 3 of this contract.
Aet. 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
Aet. 9. Delays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the *646 contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes: Provided further, That the contractor shall within 10 days from the beginning of any such delay notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
Art. 15. Disputes. — All labor issues arising under this contract which cannot be satisfactorily adjusted by the contracting officer shall be submitted to the Board of Labor Keview. Except as otherwise specifically provided in this contract, all other disputes concerning questions arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto as to such questions. In the meantime the contractor shall diligently proceed with the work as directed.
9. The specifications upon which the contractor’s bid was submitted and which were made a part of the contract, provided in part:
Division II. General conditions
Sec. 8. Interpretations, protests:
1. The decision of the Contracting Officer as to the proper interpretation of all Drawings and the Specification shall be final, subject only to appeal in case of dispute, as provided in Article 15 of the Contract. Materials of work specified herein in words which so applied have a well-known technical or trade meaning shall be held to refer to the particular standards which such words imply.
2. No complaint on the part of the Contractor that work demanded of him is outside the requirements of *647 the Contract Documents or that any record or ruling of the Contracting Officer is unfair, shall be considered or entertained unless a protest is submitted in writing to the Contracting Officer within ten days after receipt of demands for such work or of such record or ruling stating clearly the basis of the Contractor’s objections. Unless the Contractor files such protest as above provided, he will be deemed to have accepted, and shall be conclusively bound by, such demand, record or ruling.
Sec. 28. Subcontracts:
1. (See Art. 26 of the Contract.) The Contractor shall not award any work to any subcontractor without prior written approval of the Contracting Officer, and the terms of all subcontracts shall be subject to the prior approval of the Contracting Officer.
2. The Contractor shall be as fully responsible to the Government for the acts and omissions of subcontractors and of persons either directly or indirectly employed by them, as he is for the acts and omissions of persons directly employed by him.
3. The Contractor shall cause appropriate provisions to be inserted in all subcontracts relative to the work to bind subcontractors to the contractor by the terms of the General Conditions and other Contract Documents insofar as applicable to the work of subcontractors (particularly, without limitation, as provided in Art. 26 of the Contract), and to give the Contractor the same power as regards terminating any subcontract that the Government may exercise over the Contractor under any provisions of the Contract Documents (see particularly Art. 25 and 26 of the Contract and Sec. 41 of these General Conditions).
4. Nothing contained in the Contract Documents shall create any contractual relation between any subcontractor and the Government.
Division IV. Excavating, wrecking, billing and GRADING
Sec. 5. Excavating:
1. The Contractor shall do all excavating of every description required for the completion of all portions of the building work, including excavations for cellars or basements, pits, footings, foundation walls, trenches, and other items incident to the work. All old foundation walls, slabs, columns, abandoned manholes and catch basins or other items of similar nature shall be removed down to a point 3 feet below the established levels of the final finish grade.
*648 2. The excavations in all cases shall be extended to the depths and be of the sizes required by the drawings for the installation of the new work; should greater depth than that shown be necessary to secure a solid bearing satisfactory to the Contracting Officer, the extra work shall be paid for upon the basis of unit prices satisfactory to the Contracting Officer which shall be submitted to him when required.
11. Old foundation walls, manhole and catch-basin walls, pipes, sewers, footings, etc., coming within any building site, or any cistern, basement well or pits shall be excavated to the original soil and all rubbish removed and where same occur deeper than required for new foundations the new construction shall be built down to proper bearing, except for sewers when they are 3 feet or more below bottom of footings.
Division VIL Masonrt
Sec. 24. Unit prices :
1. Footings shall be raised, lowered, reduced in size or increased in size, when so ordered by the Contracting Officer, should soil conditions warrant. After the contract has been awarded, the Contractor shall furnish unit prices covering excavation, concrete, reinforcing, and form costs, to be used as basis for a credit or debit should the work be increased or decreased.
2. The said unit prices shall meet with the approval of the Contracting Officer, before any unit price work is begun, and shall be submitted when required by him.
10. The defendant’s drawings, upon which the contractor’s bid was submitted and which were made a part of the contract, specified the depth of foundation footings. Drawing B-326 contained a note as follows:
All footings shall rest on original natural undisturbed bearing material which is assumed as follows: — Footings for Buildings #1 to 8, East Wing of 11 and 13, and Garages — Clay. Footings for all other buildings— Gravel. In any case where the assumed bearing material is not found at the elevations shown, or old basements are not found in the exact location indicated, or any other contingency is encountered which might affect the assumed safe bearing value of the soil, or its future integrity as such, the Contractor, before executing any Foundation worli, shall notify the Contracting Officer, who will consult with the Architect and issue instructions for the necessary adjustments. All changes of level of footings shall be constructed in detail as shown on Detail No. 40.
*649 The Indianapolis architect who designed the project buildings was employed by the defendant to prepare revised plans and drawings.
FOUNDATION DELAYS
11. The excavation of basements began July 31, 1935, and could have been completed by about October 8, 1935. Discovery of unsuitable bearing soil in foundation areas of each building resulted in substantial delay on the installation of foundation footings and walls. Only sufficient men and equipment were employed to keep basement excavation far enough ahead of foundation work to avoid costly sloughing and caving before walls could be erected.
Twenty-one basements had been opened, substantially in advance of foundation work, when a truck drivers’ strike on general excavation stopped these operations from November 5, 1935, to January 13, 1936. A general strike on all work concurred from November 12 to December 9, 1935.
Because foundation work was not sufficiently advanced, basement excavation was not resumed until April 1936 and was substantially completed the following month, without having caused or contributed to delay in completion of the project.
12. By letter received July 31, 1935, the defendant requested the contractor to submit the unit prices called for by the specifications, and stated it was important to do so promptly to obviate the possibility of foundation delays in the event bad soil conditions were encountered.
On August 8, 1935, the contractor commenced hand excavation of trenches for foundation walls and footings and thereafter discovered unsuitable bearing soil in varying amounts in the foundation areas of all buildings. On August 15, the contractor telegraphed the Director of Housing for authority to perform the extra excavation and concrete work on the basis of unit prices later to be established. On August 19, the Director rejected this proposal, requested submission of unit prices, and stated:
It will be necessary for the Project Manager to either wire or write this Division for approval of each suggested changed condition before proceeding with the work. If the estimated cost of any proposed change *650 amounts to less than $500, an immediate proceed order will be given, but if the estimated cost amounts to more than $500, this Division must obtain approval from the Administrator before authorizing the procedure of the work.
On August 21, the contractor submitted its proposed unit prices but the defendant unreasonably delayed its determination of unit prices until September 25, 1985. In this interval to expedite progress the contractor offered to perform the extra work on six of the ten buildings which had already been excavated to contract footing levels at a cost not to exceed $500 each. After approval by the Director, work proceeded on this basis.
13. On September 25, 1935, Change Order 1 was issued by the defendant and accepted by the contractor. It provided in part:
Whenever any changes in the depth or design of foundation footings, as contemplated by the Specification, Division VII, Section 24, is found necessary, you shall proceed with such a change upon receipt of written instructions from the Project Manager accompanied, if required by the Project Manager, by a revised structural drawing: provided (a) the amount involved in any such change does not exceed $2,500.00 and (b) the total of all such changes authorized hereunder does not aggregate more than $20,000.00. In the event any change exceeds the amount specified in (a) above or such change together with previous changes hereunder exceeds the amount specified in (b) above, the contractor shall not proceed with such change without further written direction from the Contracting Officer.
The change order set forth the unit prices and provided further as follows:
Note 3. — These unit prices and interpretation of procedure are established for application to usual conditions encountered in foundation work. Extraordinary conditions will be adjusted by special consideration at the discretion of the contracting officer.
Your itemized proposal covering each change ordered hereunder shall be submitted as promptly as possible to permit check of same and issuance of a Change Order covering the amount involved.
*651 14. When the contractor discovered unsuitable bearing soil, it orally notified the project manager, who examined the condition and directed additional excavation in some instances, but usually telephoned the local architect who came to the site in varying times from one hour to the next day. The architect probed the soil with a steel rod or had test holes dug, and then issued oral instructions as to how to proceed. On the first two or three buildings, hand excavation for the extra depths was not permitted until after the contractor had offered and the Director approved procedure on the basis that additional work would not exceed $500 in cost.
Except for the first few buildings, the project manager insisted that the trench excavation be completed to contract levels before any action was taken on unsuitable soil discovered in a portion thereof.
There was a stoppage of hand excavation on most buildings and a substantial slowing down on every building on account of unsuitable soil investigations, and in some cases, the contractor was required to leave the building and transfer workmen elsewhere. In a number of cases, the oral authorization to perform additional excavation was limited to a specified depth, and then the project manager or architect was recalled, the area reexamined, and additional excavation directed, and this process repeated until satisfactory bearing soil was reached.
Sketch drawings of the changes were prepared when the extra excavation had been completed. The work of setting forms, reinforcing steel and the pouring of concrete was then held up until the sketch drawings had been transmitted to Washington, the extra work approved by the Director, the project manager advised of the approval, and oral notice to proceed given to the contractor. This procedure was employed because of the Director’s telegraphic instructions to the project manager on September 4, 1935, that sketches of proposed changes in design of foundation footings be submitted to Washington for approval regardless of cost involved.
The formal change orders and drawings were prepared some time after the extra work was completed.
*652 15. Schedule A of this report is a tabulation of the events on foundation changes for each of the buildings, showing the dates of the commencement of hand excavation for foundation walls and footings, issuance of written notice by the contractor of its discovery of unsuitable bearing soil for foundations, forwarding to the Director of Housing by the project manager of request for approval of changes, transmitting of the Director’s approval to the project manager, issuance of written proceed order by the project manager to the contractor, and the completion of the pouring of concrete for the footings, together with a computation of the calendar days transpiring on each building between the contractor’s written notice of unsuitable soil, and defendant’s written notice to proceed.
While oral advice preceded the contractor’s written notices of discovery of unsuitable soil and the project manager’s written notices to proceed, the evidence is highly conjectural and unreliable as to when such oral communications occurred;:
16. At the commencement of the general strike on November 12,1935, the contractor had opened 21 basements, poured footings for 15 buildings, completed foundations for about 10, placed first floor slabs for 5, and just commenced brick masonry on one.
Except for the delays encountered, it would have completed foundations for approximately 20 buildings by November 12, installed first floor slabs for 14, with brick masonry and upper slab work progressed on 10 buildings in varying stages from operations on'first story to enclosure of about 3 buildings.
After the general strike ended on December 9, 1935, no further progress was made on foundation footings until the spring of 1936, because the specifications prohibited pouring of concrete on frozen ground.
17. The changes in depth and design of the foundation footings and walls were minor in nature, involving no unusual or difficult engineering problems. The contracting officer allowed total extra compensation for this work in the sum- of $13,574.37, later increased to $22,872.88 by the official representative of the head of the department. *653 Schedule A. — Summary of events~foundaHon changes OC© OCO«H^M o^ooooo»oiioc3«5eoooo t^OOWMf -I CS HNrlHrlrl iH CSHHN^HH rH i-t CD Days — from contractor's notice to proceed order 0/18/36 10/3/35 6/24/36 10/29/35 7/2/36 10/18/35 5/23/36 9/17/35 4/30/36 10/2/35 11/8/35 10/15/35 7/14/36 9/10/35 10/30/35 9/24/35 11/8/35 10/9/35 5/1/36 10/9/35 5/4/36 8/28/35 6/12/36 9/26/35 Footings completed 9/7/35 10/31/35 10/2/35 10/31/35 10/2/35 11/16/35 10/2/35 11/16/35 8/28/35 5/9/36 9/10/35 9/26/35 6/16/36 10/2/35 6/29/36 10/15/35 7/3/36 10/31/35 5/25/36 9/4/35 11/8/35 3/7/36 10/5/35 11/8/35 10/15/35 7/21/36 written proceed order issued (T) 10/22/35 • (T)5/23/36 (T)9/4/35 (TH1/5/35 (T)3/6/36 (T) 10/4/35 ’ (T) 11/6/35 (T) 10/14/35 (T) 10/2/35 ‘(T)T0/0/35 (T)(Ew)9/9/36 (T) (W W)9/24/35 (T18/28/35 (T) 9/5/35 (THO/22/35 (T) 9/9/35 (T) 9/25/35 (T) 10/29/35 (T) 10/1/35 (T)ll/12/35 (T)10/l/35 (T)ll/12/35 (T)8/26/35 Director’s approval of change (L) 10/19/35 (L)5/19/36 • (T) 9/3/35 (L) 10/31/35 (L)3/4/36 (L)10/2/35 (D1J/5/35 (L) 10/10/35 ?S/i/0J_CT)_ SS/I/OICJ,) (T)(Ew)9/6/35 (T) (W WJ9/23/35 (T)8/27/35 (T)9/3/35 (L)10/19'35 (D9/5/35 (L) 9/25/35 (L) 10/26/35 (L)9/26/35 (Dll/7/35 (L)9/27/35 (Dll/7/35 (T)8/23/35 Project mana* ger’s request to Director for approval 8/23/35 10/18/35 9/4/35 10/21/35 9/4/35 10/31/35 9/21/35 11/2/35 8/15/35 (EW) 8/27/35 5/9/36 '(Ew)8/27/35 (WW)9/18/35 5/19/36 9/13/35 6/10/36 9/20/35 5/22/36 10/16/35 5/12/36 8/27/35 10/29/35 9/18/35 10/31/35 10/12/35 5/18/36 Contractor’s written notice-unsuitable soil 8/15/35 10/18/35 8/29/35 10/19/35 8/29/35 10/31/35 9/21/35 11/6/35 8/8/35 11/9/35 8/22/35 5/19/36 9/10/35 6/5/30 9/19/35 5/20/36 9/30/35 5/7/36 8/22/35 10/26/35 9/18/35 10/22/35 10/10/35 10/29/35 Hand excavation started Building No. 21.. 22-23.. 24-10.. 11.. 12-18-14-15.. 16-17-18-19. 20-Key to symbols: (L) Letter; (EW) East wing; (T) Telegram; (WW) west Wing.
*654 The reasonable practice, employed generally in private and public construction, is that minor changes in depth and design of foundation walls and footings are promptly determined and approved by representatives of the owner at the time of the discovery of unsuitable soil, and the extra excavation and construction permitted to proceed forthwith.
The procedure employed by the defendant of communicating back and forth from Indianapolis to Washington was reasonably expedited, but unreasonably delayed minor changes fundamentally necessary to the project.
18. The delays in determination and approval of the extra work on foundation footings disrupted the operations. The contractor was required to transfer from one building to another without benefit of any reasonable construction plan. Foundation walls in some cases had to be erected for only part of a building, and later the portion involving changes installed. The normal practice-of continuous concrete pours of footings for an entire building was made impractical by changes in portions of the footing areas, and portions of the footings were oftentimes poured to advance the work, with protecting bulkheads constructed against the uncompleted foundation changes.
Had the determination of footing changes been made at the project site as the various occasions arose, and the work allowed to proceed, the extra work would not have extended the contract performance more than 38 calendar days, and it is reasonable to conclude that the foundations would have been substantially completed by the commencement of the general strike on November 12,19.35.
19. After the general strike ended on December 9, 1935, work proceeded on placing of forms and pouring of concrete for foundation walls and first floor slabs. The brick masonry work was stopped by a mason tenders’ strike from November 4, 1935 to January 30, 1936, but foundation work was not sufficiently advanced to permit resumption of this work until March 1936.
As was reasonably to be expected in the project area, there were 24 calendar days of severely cold weather, two in December, and the remainder in the period from January 22 to February 20, 1936, on which no construction work was performed, and concrete pouring and brick masonry would *655 have been stopped in any event. Thereafter, general operations recommenced. On March 10, the brick masons resumed exterior wall construction, and on that day the carpenters struck because ironworkers were setting metal windows. This jurisdictional dispute lasted until April 22, 1936, and delayed installation of formwork for footings, walls and slabs, but brick masonry and other work continued.
Concurrent delays in overall foundation work resulted from unreasonable time taken by the defendant to decide upon minor changes in the depth and design of portions of buildings 12 and 16 to provide basement storage and maintenance-repair space. Although the defendant submitted its change drawings about March 22 and the contractor forwarded its price proposals on April 3, the defendant failed to decide upon the changes until May 19, 1936, and completion of the excavation of the two basements and erection of foundation walls was to that extent delayed. The foundation work was not completed until about August 10,1936.
20. The contracting officer issued various change orders for the extra work on foundations, necessitated by discovery of unsuitable soil, and extended the contract time of performance, as set forth in the following tabulation:

*656 All of the foregoing change orders were duly appealed to the Administrator.
With respect to Change Orders 32, 36, 37 and 41, the contracting officer submitted each appeal in a separate “Memorandum to the Administrator” which was thereafter indorsed “Approved: Horatio B. Haekett, Assistant Administrator, Nov. 3, 1936.” Each memorandum recited no facts, but merely stated procedural status and concluded that the contractor had oifered no tangible justification for refusal to accept the change order. It is reasonable to conclude that no independent investigation or determination was made of these four appeals at that time.
All of the change orders in the foregoing tabulation were later considered and determined by the appeal officer duly appointed by the head of the department, as more particularly set forth hereinafter.
21. On October 19, 1938, the contracting officer assessed liquidated damages and backcharges for corrective work, and issued schedules and findings to the contractor, which stated in part:
Latent soil conditions involved increased depth of excavation, and revised footing and foundation structures in portions of each building of the project; including certain soil tests, revision of drawings and specifications and additional labor and materials required (51) calendar days for the execution of the additional work involved.
He specifically excluded weather conditions from his determination of extensions of contract time on the stated ground that determination of weather delay was the function of the Comptroller General.
22. At conferences held between the contractor and officials of the United States Housing Authority, October 20 to 25, 1938, the contractor contended that Change Order 1 did not include all items of labor and material used on the foundation footing changes, and submitted proposals for revision of the change orders.
23. On November 16, 1938, the Administrator appointed Ernest L. Smith, a private individual engaged in the construction business, to act as his duly authorized representa *657 tive under the contract. The letter of appointment read as follows:
. You are hereby. designated to act as my duly authorized representative, as contemplated by Article 15 of the contract entered into between the United States of America and the N. P. Severin Company .* * * for the purpose of hearing, considering and deciding all appeals from the rulings of the Contracting Officer' or Officers arising out of said contract.
In considering such appeals, the services of the members of the Construction Review Division and of the General Counsel’s office are hereby made available to you.
24. Mr. Smith increased the prices on the foundation footing change orders from $13,574:47' to $22,872.88, by adding various items of labor and material omitted from Change Order 1. The revisions were accepted by the contractor on May 18,1939, and later paid by the defendant, without prejudice to the contractor’s claims on account of delays, damages and disruption of the work.
25. In his Findings and Decisions, dated September 21, 1939, Mr. Smith found that contract performance was delayed 176 nonconcurrent calendar days by foundation footing changes, and stated as follows:
In connection with the foundation changes I find that a total of 51 days extension of time has been previously granted as follows:
On 2 buildings — 1 day each- _:— 2 days
■ 17 buildings — 2 days each !_34 days
5 buildings — 3 days each— -15 days
24 buildings 51 days
This represents only the actual time required to physically perform the additional work involved and does not take into account the cumulative effect of the delays which accrued building by building while waiting for decisions, information, revised plans and proceed orders covering.the additional work required for each individual building, the extent of which was left for future determination, and which has not heretofore been determined. It is now determined that' all these delays, including the time required for the physical performance of the additional work involved, totaled 176 non- *658 concurrent calendar days. I therefore extend the contract time for completion by 176 calendar days.
It should be noted that the original progress schedules of the Government and of the Contractor contemplated completion of all foundation work in about 4 months. It was actually completed in about 13 months.
He further found that labor disputes delayed the' contract performance an additional 65 calendar days, 57 of which resulted from strikes which occurred prior to May 1936. Weather delays were not mentioned by him.
LEAKING WALL DELAYS
26. The basic specifications provided that the face brick would have a back-up of hollow concrete or clay tile, but the contractor’s bid on alternate specifications was accepted, and the defendant, with a slight reduction in the contract price, required the use of hollow Haydite blocks, and eliminated the specification for asphalt dampproofing to be applied to the interior surfaces of the back-up tile of all exterior walls.
The Haydite block, having two vertical cells each about four inches in diameter, was manufactured from fine aggregates of burnt shale and cement, and was highly pervious to water, much more so than concrete or clay tile. The specified face brick were also highly absorptive.
Alternate courses of the blocks were “L” shaped to allow the header course of face brick to be set lengthwise into the wall. The specification and design allowed a space of % inch or less, between the face brick and back-up blocks, to be filled with mortar by parging. The headers, at every sixth row of the face brick, extended through this space and projected halfway over the vertical cells of the blocks.
27. The project engineer advised the contractor by letter dated October 18,1935, that since dampproofing was omitted, it was very important to observe every precaution to make the walls as impervious as possible by giving particular attention to the jointing specifications.
*659 28. The brick masonry work commenced October 23,1935, and only part of the first story of one building had been erected when further operations were stopped by a mason tenders’ strike from November 4, 1935, to January 30, 1936. Work recommenced March 10, 1936, and exterior walls were completed December 24, 1936, and interior partitions January 21, 1937.
29. The defendant’s inspectors closely observed the exterior wall construction. At the outset of the masonry work, the project manager complained that face bricks were being laid without full mortar joints, but thereafter no complaint was made of workmanship until the buildings had been enclosed, and water penetration through the walls commenced.
30. The contractor, in accordance with the specifications, obtained defendant’s approval of samples of the brick, blocks, and mortar, and the exterior walls were constructed of materials which complied with the specification requirements.
31. Sample walls were constructed under the direction of defendant’s project officers before exterior-wall construction began. The defendant’s local architect and project engineer then disputed between themselves whether the %-inch space between the face bricks and back-up blocks should be filled solid with mortar. The project manager directed it should be and required the contractor in construction operations to apply a full coat of parging to the inside surface of the face brick and slush the joint solid as the back-up blocks were laid. It was impractical to fill the space completely by parg-ing, and the slushing tended to cut and disturb the parging coat.
32. In early October 1936 water from heavy rains penetrated the walls of almost every building, causing damp spots to show in the plaster. The contractor notified the Director who replied that the project manager’s analysis was that while the bricks were highly absorptive, the dampness was due to incomplete work on roof flashings and caulking of stone coping joints and window frames.
Thereafter, at times of heavy rains accompanied by driving wind, the water freely penetrated the exterior walls, and *660 the contractor repeatedly notified the defendant and requested direction concerning the problem.
The walls leaked where there were no windows and also at places where the windows and stone coping had been thoroughly caulked, and continued to leak when all caulking had been carefully done.
Roof flashing work had not been completed when the first leakage occurred, but leakage occurred where flashings had been installed, and continued when all this work had been performed.
33. The specifications required that upon completion of the masonry work, the exterior walls be cleaned, working from the top down, and that as cleaning progressed, all holes, cracks or other defects would be pointed and filled.
On October 23,1936, the project engineer complained that unsatisfactory pointing was causing the water penetration.
The general condition of wall leakage existed in buildings where pointing had been completed. It continued after all buildings had been pointed and in buildings repeatedly repointed.
34. The leaking wall condition became progressively more serious, and on November 2, 1936, the contractor asserted that the highly absorptive materials were the cause, and suggested to the Director that both the exterior and interior surfaces of the walls be waterproofed.
On November 16 and December 3, the contractor urged the. Director to send an investigator from Washington to which requests the Director replied on December 4 and 12 that his investigation was not complete and that the contractor would be informed when decision was made.
35. In December 1936 the contractor conducted spray tests where pointing had been meticulously done, and water penetration occurred within an hour and a half. It advised the Director and contended that leakage was due to specified materials and faulty design, which the Director denied by letter of December 30, asserting that when pointing was complete, it was likely the leaky conditions would disappear.
*661 36. In early January 1937, heavy rains penetrated the walls to the extent that water stood on the wood floors. To the contractor’s urgent requests that something be done, the Director replied that his investigation was not complete but it was the contractor’s responsibility to build walls complying with contract requirements.
The Director sent a representative from Washington who superficially inspected the project on January 18, 1937, and held conferences with representatives of the contractor and the project officers, which only resulted in the continuation of the dispute as to responsibility.
The water penetration discolored the plaster, blistered the painted walls, damaged flooring, rusted hardware and the metal window frames, increased condensation in the buildings, required additional heating, and generally delayed the progress of and damaged interior work.
The laying of wood floors had to be discontinued during the period from January 14 to April 21,1937.
Excessive moisture and condensation in the buildings required opening of windows for ventilation and made it practically impossible for the contractor to maintain the required temperature of 50 degrees Fahrenheit while plaster was drying.
37. On March 9, 1937, the contractor interviewed the Director at Washington and offered to expend an estimated $25,000 to waterproof the exterior wall surfaces, without prejudice to the issue of responsibility for leakage or who would ultimately bear the cost. The contractor’s offer was never accepted, although the defendant in 1938 ultimately applied exterior waterproofing to the entire project.
38. The Director of Housing referred the contractor’s further letter concerning leaking walls, dated March 6,1937, to the Inspection Division, Public Works Administration, for consideration and reply. The project engineer and inspectors were representatives of this Division, in daily attendance at the site.
*662 On April 2, 1937, the Director of Inspection wrote to the contractor from Washington, in part, as follows:
We have not been previously advised that the condition of the masonry was such that all areas leak seriously. If they do, we will be glad to cooperate in any way possible towards the solution of your problem but it is up to you to suggest how you propose to correct the trouble.
This letter further accused the contractor of laxities in observing details of the specifications, which “could be factors contributing to leakage,” alleged that the contractor had failed to offer remedies, and stated that the contractor would have to determine the corrective methods to complete the project, and that it was understood that any such measures would have to be conducted at no increase in the contract price.
On April 12, 1937, the contractor replied and submitted a ten-page review of the leaking walls situation, referred to and repeated its previous offer to waterproof the exterior walls, advised that water was still penetrating the walls seriously, and that contractor expected compensation for delays and damages caused by faulty specifications and design.
By letter dated April 19, 1937, the Director of Inspection reaffirmed his letter of April 2 as explaining the defendant’s attitude in the matter, and requested expedition of completion of the contract.
39. The contractor proceeded with all work beginning April 21, 1937, but thereafter whenever wind-driven rain occurred, the water freely penetrated all of the windward walls.
By letter dated May 17, 1937, the contractor advised the Director of Housing, as follows:
Attention is directed to the fact that we have found, in several instances, that a definite horizontal separation has occurred in a brick-joint directly at the corners of certain buildings at the approximate level of the top of the roof slab.
We are making further search for such locations but cannot definitely say at this time what may be causing this separation.
*663 It is believed, however, that it is caused by either settlement of interior column footings or expansion in the concrete roof slabs.
The matter is brought to your attention for investigation.
It is quite possible that this has some bearing on the penetration of water through the exterior walls.
Except for acknowledgment of receipt, the defendant failed to reply until October 22,1937, when the Director advised that the project manager would proceed with caulking operations on the separation cracks.
This condition became progressively worse until throughout the project there were numerous separation cracks in the mortar joints at or about the floor and roof slab levels. They were generally horizontal, but in places jogged vertically and resumed a level course. Many were repeatedly repointed by the contractor, but separation would occur again. The cracking was especially bad at the building corners, but in many instances extended across the entire length or width of a building wing.
In numerous places, the brickwork was pushed out as much as % inch or more along the slab level, and at some places as much as % or % inch. Many cracks were so large that an ordinary envelope or postcard could be readily inserted. Some cracks extended through the entire wall so that daylight could be observed through them.
40. The concrete roof and floor slabs rested directly on the Haydite back-up blocks, and their outside edges extended across the blocks to within % inch of the face bricks. The slabs varied from 100 to 190 feet in length and 27 to 40 feet in width, and there was no provision made in the specifications for expansion and contraction, but it was required that the slab be made with continuous pours of concrete and without construction joints. The parapet walls were constructed entirely of brick and rested in part on the roof slab and on the exterior tier of face bricks.
41. The expansion and contraction of roof and floor slabs caused movement and cracking of walls, spalling and popping of mortar joints, created defects where pointing had *664 been completed, loosened flashings, and cracked plaster and some slabs. It is reasonable to conclude that the parged and slushed joints between the face bricks and back-up wall were substantially affected.
Normal shrinkage of the concrete slabs and their supporting columns contributed to wall movement and resultant damages. Their shortening tended to pull opposite walls together and let slabs down in the interior and increase the weight pressure on the exterior walls. The slabs had a tendency to curl upward at their edges, particularly at the building corners, exerting a lifting pressure on the brick masonry and creating separation cracks. The parapet walls tended to lift and move and caused disjointing of roof flashings.
The specified mortar was of high cement and low lime content and relatively quick-setting. Its use with the highly absorptive face brick resulted in mortar shrinkage cracks throughout all exterior walls, which substantially contributed to cause the wall leakage.
This whole process, gradually taking place over an extended period of time and resulting from faulty specifications and design, was the cause of the wall leakage, contributed to by the high porosity of specified masonry materials and their assembly design.
42. Ernest L. Smith, the duly authorized representative of the Administrator, on March 23, 1939, made the following findings with respect to leaking walls:
Examination and consideration of all the evidence at hand compels the following conclusions:
That the chief contributing factors to the leakage through the walls, none of which were the contractor’s responsibility, were:
1. Lack of bond between brick and mortar. This was a large factor;
2. Open cracks resulting from fractures caused by movement of roof and floor slabs; and
3. Omission of dampproofing. This was very serious.
That the contractor did fulfil his contractual obligations in respect of the construction and pointing of the masonry walls; that he is not responsible for the leaky *665 condition thereof; and, that he is not responsible or liable for consequential damages or delays resulting therefrom.
In his Findings and Decision, dated September 21, 1939, Mr. Smith stated in part as follows:
In my findings and review I have referred in much detail to the leaky wall condition and the controversy arising therefrom, which continued for more than six months. I have pointed out that in January of 1937 conditions in the building became so bad that the Contractor, to protect his interests and those of the Government as well, practically stopped the installation of interior work which would be subject to water damage. For a period of three months, until the Government ordered him to proceed with that work late in April, there was little progress made outside of plastering. There is no doubt that this condition, for which I have previously found the Contractor was not responsible, did seriously interfere with normal progress and substantially delay completion of the Project. From a careful study of this whole situation I am convinced that ultimate completion was actually-delayed on this account by some 6 to 8 weeks. I, therefore, grant an extension of the contract time by 42 calendar days.
DELAY IN ACCEPTANCE
43. The specifications provided that when the work was practically completed the contractor was to notify the contracting officer in writing that the work would be ready for final inspection on a definite date, and that such notice was to be given at least 10 days prior to the date stated for final inspection.
By letter dated July 1, 1937, the contractor advised the Director of Housing that barring circumstances beyond its control, the project would be ready for final inspection on August 1,1937.
44. When a building was considered ready for punch-list inspection, the contractor notified the project manager. Thereafter, the defendant’s inspectors examined the building and prepared a list of defective items, which was submitted to the contractor for corrective work.
*666 Schedule B of this report is a summary of the events on the punch-list inspection and corrective work on each of the 24 project buildings.

45. The defendant consumed an average of 14 calendar days per building from the time a building was turned over until the punch list was prepared, and an additional 9 calendar days until the list was submitted to the contractor. The reasonable time needed was 2 days per row house and 3 days for each of the other buildings.
On August 5, 1937, the contractor by letter complained of the delays and advised that it would claim additional costs.
The defendant’s unreasonable delays prolonged the corrective work of the contractor and subcontractors, requiring workmen to wait for punch lists, and delaying the process of turning buildings over for inspection.
46. Despite the existence of the separation cracks the Director by letter dated August 27, 1937, stated to the contractor that according to the project manager, recent water penetration was due to improper pointing and defective roof *667 flashing and caulking work, and directed the contractor to proceed within ten days with corrective work or the defendant would employ the necessary force and prosecute the work to completion at the expensé of the contractor.
Although again denying responsibility in his letter dated September 7,1937, the contractor recalled workmen and performed additional repointing and recaulking and repair of flashings made necessary by faulty specifications and design.
On November 12, 1937, the contractor conferred with the Director at Washington, who then stated that he was advised the exterior walls were in good shape and declined to go to the project as requested by the contractor. Water penetration continued until defendant’s corrective work of grouting shrinkage cracks, caulking separation cracks, pointing spalling defects in mortar joints, and waterproofing of exterior walls had been completed in 1938.
47. The contractor had performed under protest much corrective work of water damages, but declined to remedy numerous items on the punch lists, including cracked walls, discolored and cracked plaster and other damages resulting from water penetration.
Small chips of concrete had popped off the slabs forming the ceilings in some apartments caused by dolomite which became intermingled with some of the cement while on railroad cars in transit to the project site. The contractor had proceeded to remedy the defects as spalling occurred. The defendant stopped the work in three apartments to have tests performed of the concrete in the slabs, but ordered the contractor to proceed September 1, 1937.
48. During September 1937 the contractor was engaged in some contract work, exclusive of punch-list items and water damages. It patched some spalled ceilings, completed installation of refrigerators and medicine cabinets, installed window shades, repaired sidewalks, and cleaned and tested electric ranges.
The contractor had substantially performed the contract work and thoroughly cleaned all buildings before they were turned over for inspection. The buildings were generally unfit for occupancy on September 15, 1937, only because of the water damages and continued penetration of water.
*668 About September 25, 1937, tlie contractor and subcontractors reduced their crews of carpenters, painters, plumbers and laborers to skeleton forces, but the contractor was required to keep its field office and a force to maintain and protect the buildings.
49. Ernest L. Smith in his Findings and Decisions, dated September 21, 1939, stated that the defendant’s records showed conclusively that all of the contract work had been completed by the latter part of August 1937, except for some minor punch-list items and many items of water damages for which the contractor was not responsible. After commenting on the spalling ceilings caused by dolomite particles in the concrete, he stated further as follows:
I now find, and it is my decision, that as of September 1, 1937, the Contractor had furnished all labor and materials and performed all work required for the construction of the project, except as above noted, and that the Contractor was ready, able and willing to correct and make good such defects that had developed or might develop. I, therefore, establish September 1, 1937, as the date of completion of the project.
50. The dispute over responsibility for wall leakage continued, and the defendant sent inspectors from Washington to examine the buildings from October 25 to November 4, 1937, and another complete set of punch lists was prepared. About 90 to 95 percent of the items listed consisted of cracked and discolored walls and plaster, flashing and caulking loosened as a result of masonry movements, rusted windows and hardware, defective flooring, and other items resulting from water penetration. The contractor declined responsibility and refused to remedy such damages.
51. By letter dated November 13,1937, the project manager directed the contractor to provide temporary heat until such time as the project was accepted by the defendant. The contractor complied, but in its letter to the Housing Division, dated November 15, 1937, disclaimed responsibility and stated that it would file claim for all costs of furnishing temporary heat.
52. By letter dated December 4,1937, the contractor stated to the project manager that it was stopping all services except those absolutely necessary to protect the buildings, and *669 on December 6 further stated that defendant’s workmen engaged in caulking separation cracks would not be permitted use of the building interiors because of serious damages done by them, and that only defendant’s inspectors and officials would be admitted to the buildings.
By telegram to the Director, transmitted December 15, 1937, the contractor again requested decision on acceptance of the project.
53. Notice to the contractor of the termination of its contract was given by the Administrator in his letter dated December 17,1937, as follows:
This acknowledges your telegram of December 15, addressed to Mr. J. B. French, Director of Federal Construction. The Authority will on Monday, December 27, 1937, take possession of the Lockefield Garden Apartments Project, H-1601, Indianapolis, Indiana. On and after that date you will not be required to furnish further watchman services, heating, insurance protection, or other services.
The taking over of this project is not to be construed as an acceptance of your work as having been completed in accordance with contract requirements. This action is being taken by the Authority as the only apparent means available to terminate the present situation which is occasioned by your failure and refusal to make the corrections and perform the work needed to complete your contract in accordance with its terms. Details of the necessary corrections have been furnished you from time to time and there is no need now to repeat them as you have been fully advised of the Authority’s position.
The Authority is now undertaking some of the work necessary to complete the project and make it ready for occupancy and it will as soon as possible proceed with such further work as may be needed. Such of this work as should have been performed by you under your contract will be done for your account and charged against you, and the Authority will look to you for reimbursement of such resultant damages as it has suffered or may suffer through your failure to complete your contract work within the time specified.
The necessity for this action is regretted, but it appears that the differences between us have become so irreconcilable that the termination of your contract by the Authority is the best means of safeguarding the interests of all parties concerned.
*670 54. By letter to the Administrator, dated December 23, 1937, the contractor protested the termination of the contract without acceptance of the wort, and stated as follows:
We have received your letter of December 17, 1937, in which you state that you are taking over the Locke-field Garden Apartments, Project No. H-1601, at Indianapolis, Indiana, on Monday, December 27, 1937, and that you are “terminating” our contract covering this project.
We completed our agreed work under this contract several months ago and there have been long delays caused by you. We deny that you have any legal grounds or justification for terminating our contract long since fully completed. We further deny that we have any liability for any of the work which you have recently done at this project as all of this work resulted from your own faults and errors. We accordingly protest any deductions by you from moneys which may be otherwise due us and deny any liability for any damages you may claim in connection with this project.
We hereby notify you that we expect to retain and maintain all of our rights in this situation and that we protest vigorously against your termination of our contract and reserve fully any and all rights which we have in this matter, under the contract or otherwise. We will, of course, on demand, surrender the keys to you and you will do as you like as to maintenance, etc. We have had this uncalled for burden for many months, for which we will expect full and complete reimbursement from you.
55. In response to contractor’s letter dated October 11,1937, reiterating its claims for increased costs and damages because of delays caused by the defendant and requesting advice as to whether the Director had authority to consider the claims, the Director replied under date of October 20, 1937, that his authority could be determined only upon the filing of a definite claim and stated in part as follows:
You realize that on both of these projects [Indianapolis and Atlanta] the files are full of vague and indefinite claims, protests and appeals. In the majority of them no amount of money is claimed, and, in fact, during the later stages of both contracts the Government could not make the simplest change or interpretation without having you as a matter of form take exception to it. The multiplicity and vagueness of these claims, *671 together with the fact that of necessity many of them must overlap, led me to suggest that they be held for determination until the end of the contract. This suggestion was agreed to by you and I can see no valid reason at the present time for not following this procedure.
56.As authorized and directed by the Administrator, a group of three- independent engineers inspected the project from December 28 to 30,1937, and filed their written report, on which the Administrator’s representative relied in making his later determinations. They stated that there was no evidence of water penetration from roofs and flashings, that the buildings were of good masonry workmanship, that the main contributing factor to open joints and water penetration was the expansion movement of the roof slabs, and slighter movement of the floor slabs, aggravated by the use of a relatively quick-setting mortar which resulted in hairline cracks in the joints. They recommended that the defendant’s caulking of separation cracks continue, with extreme care taken to eliminate vibration so as not to shatter the brick or disturb the bond, and’ that all joints be very carefully examined and all defective joints cut out and caulked. They suggested that canvas might be secured to spalling ceilings, but that they would prefer to take the slight risk in permitting occupancy rather than incur this expense.
FINDINGS AND RECOMMENDATIONS ON APPEAL
57. Ernest L. Smith, the Administrator’s duly authorized representative, was a practical construction man of extensive experience. He acted impartially and honestly in his consideration and determination of appeals. No inference can be drawn from the evidence that he engaged in any conscious wrongdoing or was actuated by any intention to cheat or be dishonest.
58. The defendant performed corrective work from about October 28,1937, to October 1938.
On October 19, 1938, the contracting officer submitted to the contractor backcharges for all corrective work, except the caulking of separation cracks. He reviewed all causes for *672 delay, and assessed liquidated damages for 102 calendar days’ delay after September 15 to December 27, 1937, and further charged the contractor with certain maintenance costs incurred from December 27, 1937, to February 15, 1938, the date when project apartments were first occupied by tenants. The contractor duly appealed to the Administrator.
In his Findings and Decisions, dated March 23, 1939, Mr. Smith found that the contractor was not responsible for the leaky condition of the walls and resultant damages, and reduced the backcharges to items of noncompletion of and noncompliance with contract work. The backcharges and assessments of the contracting officer and of Mr. Smith were as follows:

The sum of $7,364.81 was deducted in arriving at the contract payments authorized by the General Accounting Office, and the contractor does not seek recovery of Mr. Smith’s backcharges. The defendant by its counterclaim seeks re-coupment of items 5,7, 8 and 12 above.
Mr. Smith found that the backcharged items, other than those assessed by him, resulted from specified construction and design, and further stated that the contractor had suffered delays for which he was not responsible which more than offset the 102 calendar days on which liquidated damages were calculated.
59. On June 2, 1939, the Administrator forwarded to the Comptroller General for direct settlement, with copies provided to- the contractor, a voucher for the total claims, the change orders revised as to prices (Finding 24 herein), Mr. *673 Smith’s Findings and Decisions, and a statement showing the balance of the contract price to be $116,483.10. After approval by the General Accounting Office, this sum was later paid to the contractor.
The Administrator further advised the Comptroller General that the claims for damages on account of delays were being analyzed and would be forwarded at an early date.
60. On September 21, 1939, Ernest L. Smith issued and transmitted to the General Accounting Office the second of his Findings and Decisions, with a copy provided to the contractor. He made findings regarding foundation delays, leaking walls, and delays in acceptance, as set forth in Findings 25, 42, and 49 herein. He further stated as follows:
I find from my examination of the records that there accrued in actual nonconcurrent delays a total of 436 days, that pursuant to Article 9 of the contract would extend the contract period from August 10,1936, through October 20,1937. Of these 436 days 65 were occasioned by strikes, 329 days were occasioned by changes initiated by the Government, and 42 days resulted from the leaky walls.
With respect to delays caused by strikes, Change Order 61 had been issued February 23, 1937, extending the contract time 182 calendar days on account of labor disputes occurring before August 10, 1936. On March 22, the contractor refused to accept and requested the matter be held in abeyance until its claims could be presented, to which the Director of Housing agreed by his letter dated March 27, 1937. All strike delays were considered by the contracting officer in his assessment of liquidated damages, from which the contractor duly appealed.
Mr. Smith made findings with respect to each of the seventeen strikes on the project work, and reasonably determined that thirteen were incidental to portions of the work and had no effect upon over-all contract completion. He found that four strikes, the general strike from November 12 to December 9, 1935, the carpenters’ strike from March 10 to April 22,1936, and two other minor disputes, extended the project work 65 calendar days. The contracting officer had allowed a total extension of 284 calendar days on account of labor disputes.
*674 Mr. Smith concluded his second Findings and Decisions with a statement that he had been advised that he lacked authority to consider the claims for additional costs and damages resulting from the leaky wall condition and delays caused by the defendant, and that it was not proper for him to make findings with respect to their validity or merits or to attempt to evaluate them. These claims had not been determined by the contracting officer.
61. In response to requests from the General Accounting Office, Ernest L. Smith issued and transmitted through the Administrator to the Comptroller General two sets of findings and recommendations, dated February 28 and August 6,1940, concerning the delay claims which he had previously declined to determine. Copies were provided to the contractor.
In the February recommendations, Mr. Smith stated that the 118 days’ delay in acceptance was partly due to tardiness on the part of the defendant’s inspectors in making inspections and preparing punch lists, but mostly resulted from the controversy concerning leaky walls. He further stated:
* * * Article 3 of the Severin contract, and of all P. W. A. Housing Division contracts, provided that an equitable adjustment would be made in the contract amount for changes. We find in our files no administrative ruling with respect of the percentages allowable for the prime contractor and the sub-contractor other than approval of a great many change orders for changes and extras which carried the same percentages for overhead and profit used in connection with changes and extras on this contract, and which have thus been established by precedent of repeated administrative approval as proper.
Mr. Smith considered and recommended payment of various items of increased costs resulting from delays and added percentage allowances for overhead and profit. Without the profit items, his recommended damages were $101,358.96 for the contractor and a total of $66,403.82 for various subcontractors. These amounts were computed on the basis of the extensions of contract time for all change orders, plus delays resulting from leaky walls and additional *675 delays in acceptance of the work, minus 65 days attributable to strikes.
On September 13, 1941, the contractor’s claims, recommended for payment by Mr. Smith, were disallowed by the General Accounting Office, as being unliquidated damage claims primarily for determination in the courts.
DELAYS ATTRIBUTABLE TO THE DEFENDANT
62. The non-concurrent and unnecessary delay caused by the defendant on foundation changes extended the contract performance 80 calendar days. This was in addition to the time reasonably necessary to the determination and performance of the extra footing work and the 24 days lost in the pertinent period on account of cold weather.
The non-concurrent delays caused by the defendant in connection with leaky walls and failure to accept the project were respectively 42 and 102 calendar days.
contractor’s damages
63. Job overhead supervisory expense. The contractor employed on the project work a general superintendent and assistants, a general carpenter foreman, timekeeper, clerks and watchmen, and in this respect incurred continuing expense which increased in the approximate proportion to the prolongation of the work period. The average daily cost to the contractor for the 903 calendar days from July 8, 1935, to December 26,1937, both dates inclusive, was $47.70.
64. Other job overhead expense incurred by the contractor, which increased in proportion to delays in performance, were as follows: Travel, $3,244.21; telephone and telegraph, $2,205.20; insurance on materials and construction, $6,791.08; light and power, $1,051.13; ice and salt tablets, $196.53; and general field office expenses, $951.65.
The total for the 903 calendar days was $14,439.80, and the average daily expense was $15.99.
65. Concrete inspection and tests. The specifications required a continuous inspection of cement and aggregates during concrete operations, and also compression tests of cylinders made from concrete samples, with certified reports by a testing laboratory approved by the contracting officer. *676 The concrete inspection covered the period from August 19, 1935, to December 23, 1936, or 490 calendar days, and the costs increased in proportion to the delay in placing concrete. It is reasonable to conclude that the concrete pouring was delayed to the full extent of the 80 calendar days of unnecessary delay due to foundation footing changes.
The average daily expense for concrete inspection and tests was $10.31 for the 490 calendar-day period.
66. Temporary heat. The specifications required the contractor to furnish temporary heating sufficient to maintain a temperature not less than 50 degrees Fahrenheit throughout each building from the time plastering commenced until the building was accepted.
The contractor originally planned to start the plastering early in March 1936 and complete it by June 15,1936. Except for the over-all delays encountered, temporary heating would have been unnecessary up to August 10, 1936, the original contract completion date, except for the period from March through May 1936.
Over its timely written protests that delays had necessitated the expense and that reimbursement would be asked of the defendant, the contractor expended $23,682.75 for steam for temporary heating from November 23, 1936, to May 27,1937, and $7,102.55 from November 14 to December 26, 1937. Plastering began about September 1936 and was completed in March 1937.
The contractor’s costs after May 16, 1937, the date when the contractor would have completed the contract but for the delays attributable to the defendants, was $8,503.18.
While the penetration of water into the buildings increased the temporary heating requirements, the evidence affords no way to approximate the additional costs.
67. Wage increases. The contractor was required to grant wage increases to various classification of workers, in excess of the minimum rates contained in the contract and specifications. The plaintiff now claims only those increases for carpenters at five cents per hour after January 1,1937, totaling $336.60, and for cement finishers at the same increase beginning April 13, 1937, totaling $119.59, each total including payroll insurance and unemployment compensation taxes. *677 The total additional costs were $456.19, of wbicb about $287.67 resulted from delays attributable to the defendant.-
The contract and specifications provided that minimum wage rates were subject to change by the Administrator on recommendation of the Board of Labor Review, duly created and charged with determining whether there were fundamental changes in economic conditions, and that if the Administrator acting on such recommendation established different minimum rates, the contract price would be adjusted accordingly on the basis of all actual labor costs on the project to the contractor, whether under the contract or any subcontract, and that no adjustment would otherwise be made. It was further provided that the decision of the Board was binding upon all parties.
On January 8, 1936, the contractor advised the Director of Housing that a general demand existed among all trades and crafts for wage increases and requested an immediate investigation as to changed economic conditions. On January 20, 1936, the Director replied that in his opinion the demands did not result from changed economic conditions and should be disposed of by the contractor, and on February 13,1936, wrote the contractor that while he saw no need for such action, there was nothing to prevent the contractor from making a direct request to the Board of Labor Review.
Neither the contractor, nor any subcontractor, nor anyone in behalf of the defendant ever requested the Board to hear and determine the issue of changed economic conditions, and the Board never acted on the matter.
68. Increased social security taxes. Payroll taxes for unemployment relief were imposed upon wages at.a rate of 1.3 percent beginning April 1, 1936, and increased to 3 percent January 1, 1937. The contractor’s taxes amounted to $2,697.34 for the 635 calendar day period after March 1936.
The approximate increased cost caused by delays attributable to the defendant amounted to $952. Of this sum, $127.35 was included in the preceding computation of job supervisory expense and wage increases, and the net increased cost was $824.65.
69. Home office overhead. From July 8,1935, to December 26, 1937, the contractor incurred general administrative ex *678 penses in the operation of its entire business, allocable to its various jobs being performed. Of the total overhead expense of $162,890.99, $61,328.46 was reasonably allocable to the Indianapolis project, or an average of $67.92 per calendar day.
70. Repairing damaged floors. Water penetration through the building walls during January 1937 damaged finished floors. The subcontractor declined to remedy at its own expense, and the contractor agreed to and did pay the subcontractor the costs of repair in the sum of $1,119.04.
71. Equipment expense. The plaintiff claims $92.60 per day for the average time that the contractor’s equipment was retained on the job on account of delays, but failed to show either cost or reasonable value, and based its computations on the unsupported opinions of witnesses as to reasonable rental value.
On the basis of the valuations and rates set forth in pertinent schedules of equipment ownership expense, published by the Associated General Contractors, the defendant computed as to all items sufficiently described in the evidence, that the contractor’s ownership expense approximated $900.28 per month.
The average period of time that the contractor’s equipment was on the job was 16 months, about 4 months of which resulted from the foundation and leaking wall delays attributable to the defendant. It is reasonable to conclude that the contractor’s equipment expense was increased $3,601.12.
72. Additional travel expense. After the defendant took over the project, the contractor sent some of its officials to the project site in connection with the investigations being performed for the defendant, and on numerous trips to Washington to participate in the defendant’s investigations with respect to responsibility for the leaking condition of the buildings, the cost of remedial measures and final settlement of the amounts due under the contract. Additional travel expenses by the contractor’s officials were $2,868.28.
73. Increased interest expense. Because of the dispute over responsibility for leaking walls and resultant damages, the defendant withheld payments on the contract price as follows:
*679 November 18, 1938_$100,000.00
February 6, 1939_ 60, 000. 00
January 10, 1940_ 116,000. 00
March 18, 1942_483.10
The contractor was thereby, caused to pay interest on borrowed moneys after December 27, 1937, to the extent of $6,599.77, which it otherwise would not have been required to do. Interest expense before that date was included in allocable home office overhead.
74. The plaintiff performed extensive investigations to establish the cause of the leakage and possible corrective remedies. Numerous photographs were taken of the cracked areas of the exterior and interior walls and the discolored and damaged conditions resulting from water. The cost of these additional photographs was $956.99.
The plaintiff also employed outside experts in connection with its investigations, including the Bush Roberts Engineering Company, Robert W. Hunt Company, Dr. Anderegg and Dr. Voss of M. I. T. Additional expense incurred on account of such investigations was $131.24.
75. The increased costs to the general contractor resulting from delays and damaged work attributable to the defendant, are summarized as follows:
Job supervision, 224 days at $47.70_$10, 684. 80
Other job overhead expense, 224 days at $15.99_ 3,581. 76
Concrete inspection and tests, 80 days at $10.31_ 824.80
Temporary heat_ 8,503.18
Wage increases-1_ 287.67
Increased social security taxes_ 824. 65
Home office overhead expense, 224 days at $67.92_ 15,214.08
Bepairing damaged floors_ 1,119.04
Equipment expense___ 3,601.12
Additional travel expense_ 2, 868.28
Increased interest expense_ 6, 599. 77
Leakage investigations and photographs_ 1, 088.23
Total- 55,197.38
76.The contractor entered into subcontracts with the following subcontractors: Tri-State Construction Company, Jackson and Squire, Borg and Johanson, S. E. Dockstader, Katz & Lewis Plumbing Company, Leon Joyce, Acme Roofing Company, Republic Creosoting Company, Turner Resilient Floors, Inc., Hayes Brothers, Inc., C. L. Smith Electrical *680 Company, Walter Plastering Company, Browning Decorating Company, General Bronze Corporation and Charles Hass Company.
Each contract between the contractor and the above listed subcontractors contained the following provision:
The Contractor or Subcontractor shall not in any event be held responsible for any loss, damage, detention or delay caused by the Owner or any other Subcontractor upon the buildings; or delays in transportation, fires, strikes, lockouts, civil or military authority, or by insurrection or riot, or by any other cause beyond the control of Contractor or Subcontractor, or in any event for consequential damages.
77. The record contains evidence that substantial damage was suffered by the subcontractors because of the same faults of defendant which damaged the prime contractor.
DEFENDANT’S COUNTERCLAIM
78. After termination of the contract, the defendant pointed defects in masonry joints, grouted shrinkage cracks existing between face brick and mortar, and repaired roof flashings at costs respectively of $3,087.27, $38,380.64 and $838.03. All of this corrective work was made necessary because of the defendant’s faulty specifications and design.
The defendant expended $6,950.23 from December 27,1937, to February 16, 1938, the date of first occupancy of any of the apartments, for heat, light, water, and wages of watchmen and building maintenance labor. The buildings were untenantable because of water penetration and damages resulting from defendant’s faulty specifications and design.
CONCLUSION OF LAW
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover $55,197.38.
It is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of fifty-five thousand one hundred ninety-seven dollars and thirty-eight cents ($55,197.38). And the court further concludes that as a matter of law defendant is not entitled to recover on. its counterclaim which is therefore dismissed.

 The opinion and findings of fact heretofore issued in this case on July 13, 1953, are vacated and withdrawn and this opinion and new findings of fact are substituted therefor.