Davis, Judge,
delivered tbe opinion of the court:
This action arises out of a subcontract, later assigned to the Department of the Army, calling for rehabilitation of the central heating plant of the Hoosier Unit of the Hoosier Ordnance Plant (a portion of the Indiana Arsenal, Charles-town, Indiana). Plaintiff seeks an equitable adjustment to the contract price in the amount of $51,489.55, because of defendant’s refusal to shut down all three boilers in the heating plant simultaneously during the rehabilitation work. The chief issue is whether the agreement required the complete shut-down of the heating plant while plaintiff was conducting its rehabilitation effort.
In 1952, the Whittenberg Construction Co. held a prime contract with the Army for the rehabilitation of the entire Hoosier Ordnance Plant. The Plant had been reactivated during the Korean hostilities for the manufacture of ammunition — mainly propellant charges composed of smokeless, black base and double base powder — as well as of the bags into which the powder was loaded. Until September 1952, the Plant was operated on two shifts of eight hours each, but because of the increasing urgency in obtaining ammunition, around-the-clock operation was instituted at that time. Rehabilitation of the Plant was planned so that when a batch of explosives was completed in a particular production line, the line was deactivated and necessary repairs and reworking were accomplished on that line without idling the entire plant.
Within the Hoosier Unit there was a central heating plant, consisting of three large boilers, their stokers, headers, and feed pipes, as well as a water softening unit used to treat “raw” water before introducing it into the boilers (in order to prevent scaling of the boiler tubes). This central heating plant supplied steam through high pressure steam mains to all of the buildings in the Administrative and Inert Storage Areas. Generally, the heating plant was shut down from late spring until early fall for overhauling. The only building then requiring heat was the cafeteria, which was *325 supplied with steam from a small separate unit adequate for its needs. With this exception, there were no other existing heating plants or boilers which could be utilized to heat properly the buildings in the areas served by the central heating plant. Because of the vital part the Hoosier Unit was playing in the Korean emergency, it was not feasible to close the central heating plant completely during the period from September 1952 through March 1953, unless, of course, an alternative source of steam could be provided.
On September 12, 1952, the Whittenberg company issued an invitation for bids for a subcontract for the rehabilitation, in accordance with specifications prepared by the Government, of this central heating plant. In response to the invitation, representatives of plaintiff (an Indiana corporation which has been principally engaged in the erection, maintenance, and repair of steam power plants for many years) and of one other firm inspected the heating plant, accompanied by representatives of Whittenberg, of the Corps of Engineers, and of the contractor operating the Ordnance Plant for the Army. During this inspection, one of the three boilers in the heating plant was in operation, the other two being shut down due to the warm weather. Defendant’s representative orally informed the other prospective bidder, and thought he told them both, that one boiler at a time should be tom down, and the other two kept operating. Plaintiff’s representative, however, was not so instructed or failed to understand the direction, for plaintiff says that it prepared its bid upon the assumption that all three boilers of the central heating plant would be shut down during the anticipated mild temperatures in the next sixty days, so as to complete the rehabilitation work before colder weather would require the resumption of simultaneous operation; and that the small steam requirement being met by the one boiler then in operation (during the September inspection) could be taken care of by small boilers which were located on the production lines. The invitation for bids and the specifications contained no express provisions as to whether the entire heating plant would or would not be shut down during the rehabilitation, but (as we shall see) other contract *326 clauses implied that a full shut-down, at least for a period, was contemplated.
When the bids were opened, in the presence of the two bidders, plaintiff was asked to review its bid for error, since it was so low, particularly in comparison with the other bid. After reviewing the bid, plaintiff affirmed its correctness, and on September 26,1952, Whittenberg notified plaintiff that it could proceed with the work. The accepted bid promised that work would be completed 45 days after delivery of the pumps called for in the specifications; it stated further that plaintiff had received a quotation from the supplier indicating that the pumps would be received within 150 days, i.e., by the end of February or early March 1958. Nothing was said by either side, at this stage, about the complete shutting down of the central heating plant, and the other bid did not mention this matter.
The award resulted in construction subcontract No. 72 between plaintiff and Whittenberg, dated September 30, 1952, but not formally signed on behalf of the plaintiff until December 17, 1952. It bound plaintiff to furnish all plant labor, materials, and equipment, and to perform all operations necessary for the rehabilitation of the boilers in the central heating plant, in accordance with the plans and specifications, and to complete the work within the agreed time. Immediately upon receiving notice to proceed, plaintiff began to assemble the necessary men, materials, and equipment at the work-site.[1] • Early in the life of the contract, plaintiff was advised by the defendant that it would not be allowed to perform the contract with the central heating plant completely shut down; one boiler was to be maintained in full operation at all times. Between the 1st and 10th of December, 1952, plaintiff made the first of many requests that the heating plant be wholly shut down in order that the necessary work might be scheduled in what plaintiff considered a customary and orderly manner.- Subsequently, a meeting of the interested parties was held to see if a schedule could be drawn up for a shut-down of the plant. Efforts *327 were made to obtain steam from sources other than the heating plant, but they were not successful, and ultimately, except for weekend shut-downs to permit performance of some portions of the work, the central heating plant remained in at least partial operation until May 1953, when warmer weather permitted closing down its operation, as in other summers. About March 5, 1953, plaintiff received delivery of six of the seven pumps ordered.[2] Plaintiff did not complete performance of its subcontract, as supplemented and modified, until the latter part of November 1953.
In May 1953, well before the subcontract was fully performed, plaintiff proposed that consideration be given to entering into a “supplemental contract” to cover the additional costs due to the inability to shut down all three boilers simultaneously. Defendant declined such an agreement, and advised plaintiff that any claim it had for losses or increased costs should be submitted to the contracting officer after completion of the work. On December 3,1953, plaintiff filed a claim for an amount slightly in excess of the sum for which recovery is sought here, pursuant to the contract clause providing for an equitable adjustment to compensate for changes in the extent or amount of the work covered by the subcontract.[3] In 1954, the defendant accepted an assignment by *328 the prime contractor of the subcontract, in order to process plaintiff’s claim, and in 1956 and 1958 the claim was denied by the Contracting Officer and the Corps of Engineers Claims and Appeals Board, respectively. The prime reason for rejecting the claim was that there was no change in the “order of work” required by the contract, as the instrument did not call for the shutting down of the three boilers simultaneously.[4]
Though the issue is a close one, we have concluded that the Corps of Engineers erred in ruling that plaintiff’s subcontract did not contemplate the shutting down of all three boilers at once. This is a legal question on which neither the court nor the plaintiff is precluded in any way by the administrative decisions. See 41 U.S.C. § 322; Beacon Construction Co. United States, ante, pp. 1, 3, 314 F. 2d 501, 502 (1963), and cases cited; Guyler v. United States, ante, p. 159, 314 F. 2d 506 (1963); cf. Ekco Products Co. v. United States, 160 Ct. Cl. 75, 84, 312 F. 2d 768, 773 (1963).[5]
In interpreting this subcontract de novo, as we must, we gain little help from the evidence as to the pertinent trade practice. Proof of a trade usage in the business community within which the agreement was framed is normally a factor used to clarify the meaning of a contractual instrument, especially one which appears ambiguous. See Ricker v. United States, 126 Ct. Cl. 460, 465-66, 115 F. Supp. 193, 196-97 (1953), cert. denied 347 U.S. 927 (1954). Both sides have sought the advantage of this principle. Plaintiff attempts to prove an established trade practice of including a written provision in the contract if the contractor, during the course of a contract to rehabilitate a heating plant, is to be denied access to the plant in a fully shut-down condition; defendant tries to show that an agreement which provided *329 for a beating plant to be totally shut down for rehabilitation, other than in the summertime, would be irreconcilable with the accepted trade usage. Unfortunately, not only was the evidence on this point directly conflicting, but also in our view neither party has proved the existence of its asserted practice or the non-existence of the other practice by a preponderance of the evidence. This useful aid in applying business agreements is therefore unavailable to us here.
If the parties’ subjective intentions (at the time of the award) coincided, that guide to the meaning of the contract might be decisive (see Blackburn v. United States, 126 Ct. Cl. 874, 877, 116 F. Supp. 584, 586 (1953)), but in this case we are likewise deprived of that support; the parties held opposing views on the critical point. It appears certain, from the fact that the defendant told the other prospective bidder that it would not permit a complete shut-down of the heating plant, that this was the intention of the Government and its prime contractor; the mere fact that they were willing, after the dispute arose, to consider the possibility of employing alternative sources of steam in order to facilitate a complete shut-down, has little bearing on their original understanding.
Plaintiff, on the other hand, asserts that it had a contrary intention with respect to the method by which the heating plant rehabilitation was to be performed, and we find that this assertion, too, is supported by the evidence. Plaintiff’s representative specifically so testified at the administrative hearing[6] and another representative stated at the trial that this had always been the company’s practice; on balance, this direct testimony is sustained by the surrounding circumstances prior to and contemporaneous with the making of the agreement. In particular, the specifications for the boiler rehabilitation, which were prepared by the Government, provided that:
The subcontractor shall submit a complete schedule of the materials proposed to be used for the reconditioning of the boilers to the Contracting Officer for approval before commencement of the work and the installation of any materials.
*330 The specifications pertaining to auxiliary equipment controls and piping contained a similar, but more detailed, provision which required submission of the schedule of materials “as soon as practicable and within 30 days after the date of award of contract and before commencement of installation.” On their face these provisions contemplate a complete shutdown of the central heating plant — for the preparation of the required schedule of supplies — and thus confirm plaintiff’s assertion as to its own understanding. Certain other items of work called for by the specifications, such as the rehabilitation of the water softener — which was subsequently deleted, at least in part for this very reason — also seem on their face to require a complete shut-down of the heating plant (see finding 28) and therefore could reasonably have led plaintiff to assume that the absence of an explicit prohibition on a complete shut-down meant that one would be permitted, at least in the period after the award.
Defendant urges, however, that plaintiff’s assumption that it could shut down all three boilers during the anticipated mild temperatures of the 60 days following the September award, in order to complete the boiler rehabilitation before the onslaught of cold weather, is “nonsensical,” in light of the expected 150 day delivery schedule for the pumps. But there is nothing to indicate that the boilers could not be torn down, refurbished, and reintroduced into operation long before the new pumps (with the exception of the pump designated for use in conjunction with the water softener, which was subsequently deleted) were installed. In fact, the record contains strong suggestions to the contrary.[7] Plaintiff’s belief that the heating plant could be shut down for the immediately ensuing 60 days does not, on the record submitted to the court, conflict with the fact that delivery of the pumps could not be expected before 150 days.
*331 Defendant also argues that the large discrepancy between plaintiff’s bid and that of the other bidder must have alerted plaintiff to the falseness of its assumption. On this record we cannot say that the mere existence of this discrepancy would necessarily reveal to plaintiff a basic defect in its thinking. True, the discrepancy was a warning, and because of it plaintiff reviewed the accuracy of its bid. But variations, even large ones, in the terms of competing offers can be due to many different factors; they do not necessarily indicate a mistake on the part of the successful bidder.[8]
Perhaps the most persuasive arguments that plaintiff must have known that the central heating boilers could not all be shut down for a prolonged period are (i) the important place of the Hoosier Ordnance Plant in supplying ammunition for the Korean hostilities, a fact which plaintiff probably knew from its previous work at the Plant; and (ii) the cold weather in Indiana from October through March. These are troublesome points, but in our opinion do not override the opposing elements which support the plaintiff’s testimony as to its internal assumption, as well as the reasonableness of that understanding. Looking forward, the plaintiff could have thought that (a) substitute heating facilities would be temporarily furnished as a make-shift,[9] and that (b) the temperatures would not be as low as they actually turned out to be in October and November 1952. From the contractor’s viewpoint, the necessary heat could be supplied from another source without undue interruption of the work of the Ordnance Plant.
On these grounds we find that in fact the two parties reasonably intended different consequences from their agreement ; both acted in good faith and neither foresaw the misunderstanding into which the contract precipitated them. We must therefore decide the issue without the benefit of the subjective contractual concensus which is normally decisive of the meaning of an agreement. In this case, the *332 solution to the problem can be framed, we believe, in three variations, each of which upholds the plaintiff’s position.
The first was stated by the court in Peter Kiewit Sons' Co. v. United States, 109 Ct. Cl. 390, 418 (1947):
* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it.
See, also, Corbin, Contracts, Secs. 537, 559 (1952). Not only did this contract, by its silence, appear to permit the closing-down of the entire central heating plant, but (as we have noted) it included two specific clauses relating to “a complete schedule” of the material and equipment proposed to be used, which would necessitate a complete shutdown.[10] Defendant suggests that these provisions require only a schedule listing the hinds of materials to be installed, not their quantities, and therefore that a week-end shut-down would be adequate. But this interpretation cannot properly be placed on these requirements, especially when it is borne in mind that the exact extent and nature of the repairs to be needed were not known by the parties at the time the contract was executed, and that the contract contained a provision for changing the price, in accordance with agreed rates, for increases or decreases in the number of replacement boiler tubes needed. As we read them, strict and complete compliance with these requirements would necessarily have required the shut-down of the heating plant and dismantlement of all three boilers for some period. The plaintiff acted reasonably in construing this Government-drafted contract to authorize a full shut-down, and accordingly “that meaning will be given the document which is more favorable” to the contractor.
*333 An alternative phrasing for this result would be that the Government’s specifications were ambiguous on the point of a full shut-down and that the ambiguity would have to be resolved against defendant under the principle that unclear contracts and specifications should be construed against their author. See, e.g., Lilley-Ames Co. v. United States, 154 Ct. Cl. 544, 548 (1961), 293 F. 2d 630, 632; Wunderlich Contracting Co. v. United States, 143 Ct. Cl. 876, 878, 166 F. Supp. 741, 742 (1958); First-Citizens Bank & Trust Co. v. United States, 110 Ct. Cl. 280, 310, 76 F. Supp. 250, 266 (1948); Guyler v. United States, supra, ante, p. 159, 314 F. 2d 506.
The third way of putting the conclusion is that the contract terms, as objectively scanned by an outside reader aware of all the circumstances,[11] permitted a full shut-down. It is hard to escape the dominating force of those clauses and work-requirements which clearly contemplated a complete closing of the boiler plant for an appreciable period. On the other hand, the main impediments to this construction — the need for continuous operation of the Ordnance Plant and for heat during the cold months — could reasonably be thought, as we have said, to be overcome by anticipated substitute heating devices (which turned out in the actual event to be inadequate). Though each party’s conception of the method of work may have been reasonable, the plaintiff’s view more nearly accords with the design of the agreement as a whole.
For these reasons, we hold that the contract did require the Government to allow plaintiff to rehabilitate all three boilers simultaneously; the central heating plant should have been completely shut down for a reasonable period in order to enable plaintiff to do so. Kefusal to allow the shut-down “was a breach of that term which every contract contains, by fair implication, that one party to a contract will not impede performance by the other party. * * * [The contracting officer, having the power within the terms of the *334 contract,] to make an equitable adjustment to pay the damages caused by the breach, * * * should have made a fairly equitable adjustment.” Volentine and Littleton v. United States, 144 Ct. Cl. 723, 726, 169 F. Supp. 263, 265 (1959). The plaintiff properly applied for a change order under the Disputes article (Art. XVII) of its subcontract and pursued its administrative remedy.[12] Because they misconstrued the agreement, defendant’s officials refused to make the requested adjustment and plaintiff is therefore entitled to come to this court.
We agree with the Trial Commissioner that the failure to shut down all three boilers at the same time — taken by itself — contributed materially to the time required to complete the job and to the cost of performance, but the extent of the damages attributable to this cause is not yet known. The trial which has been had was limited to the issue of plaintiff’s right to recover. The defendant has raised questions relating to delays in performance for which the plaintiff is chargeable, and the costs attributable to them. These issues involve the amount of recovery to which plaintiff is entitled, if any, rather than the legal right to an equitable adjustment with which we are now concerned. It will be necessary to return the case to the Commissioner for a determination of the amount of recovery and defendant’s points can be made in those supplemental proceedings.
Plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Pule 38(c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, W. H. Edwards Engineering Corporation, is a corporation organized and existing under the.laws of the State of Indiana, with its principal office located in Indianapolis. Plaintiff has been engaged primarily in the business *335 of erection, maintenance, and repair of steam power plants for approximately 38 years.
WMttenberg Construction Co. is a corporation organized and existing under the laws of the State of Kentucky, with its principal office located in Louisville.
During the first day of the trial, November 16, 1959, and before any proof of damages was offered by plaintiff, the commissioner ruled that the trial of this case would be limited to the issues of law and fact relating to the right of the plaintiff to recover, reserving the determination of the amount of recovery and the amount of offsets, if any, for further proceedings pursuant to Rule 38(c) of the court.
2. During the Korean hostilities, the defendant reactivated the Indiana Arsenal, Charlestown, Indiana, for the primary purpose of manufacturing explosives. A large acreage of the Arsenal, known as the Hoosier Ordnance Plant, was, for administrative purposes, divided into at least three separate operating units, namely, (1) the Hoosier Unit, (2) Plant 1 Unit, and (3) Plant 2 Unit. The Hoosier Unit is the only one directly involved in this litigation.
3. During the period pertinent to this claim, the Hoosier Unit was operated for the defendant by Goodyear Engineering Corporation, under contract No. DA-ll-ll3-Ord-98, dated April 16,1951. Prior to that time, it was operated by the Ordnance Corps. Rehabilitation of the plant depended upon or was planned so that, when a batch of explosives was completed in a particular production line, the line was deactivated, and during such an idle period necessary repairs and rehabilitation were accomplished by the Whittenberg Construction Co. (hereafter called Whittenberg). This work was to be performed pursuant to a negotiated cost-plus-a-fixed-fee contract, No. DA-15-029-Eng-2121, entered into between Whittenberg and defendant, by which Whitten-berg was authorized to subcontract any rehabilitation item listed in such contract. The contract contained, inter alia., a provision for the rehabilitation of “Item 51, Central Heating Plant.” The plant consisted of three boilers and related parts, including a water softener. The water softener was used to treat the “raw” water before entering the boilers, in order to prevent scaling of the boiler tubes. Rehabilitation of the water softener would have required complete shutdown *336 of the plant, and this fact was recognized by both parties. The item relating to the water softener was subsequently deleted from the contract (see finding 32).
4. Under date of September 12,1952, Whittenberg issued an invitation for bids for the rehabilitation, in accordance with specifications, of Item 51, Central Heating Plant, Appendix “A” of the prime contract of February 16, 1951. Neither the invitation nor the specifications indicated expressly that the heating plant would be shut down during the rehabilitation work.
5. In response to the Whittenberg invitation, representatives of plaintiff and a firm known as Welker & Diehl, on or shortly after September 12, 1952, inspected the premises of the Central Heating Plant, accompanied by a representative of the architect-engineers of the Hoosier Ordnance Plant, Corps of Engineers, and of Whittenberg, the prime contractor. Plaintiff was represented by Mr. Streeter, one of its engineers. Also present was Mr. McDaniel, the heat supervisor and engineer for Goodyear Engineering Corporation, the operating agent for the Government of the Hoosier Ordnance Plant. McDaniel had particular charge of the Central Heating Plant.
6. During the inspection tour one boiler of the Central Heating Plant was in operation, the other two being shut down at that time on account of the warm weather. Opportunity was afforded the prospective bidders’ representatives to inspect the interior of one of the boiler drums and stokers, to ascertain what materials, repairs, and rehabilitation were necessary. Mr. Streeter climbed inside a boiler for purposes of further inspection.
7. During the inspection tour, Mr. Welker, of Welker & Diehl, was instructed by Mr. Luhan, representative of Haze-let & Erdal, the architect-engineers, to tear down one boiler at a time, and to keep two operating. Mr. Luhan believed it was understood by all present during the inspection tour, including Mr. Streeter, that all three boilers of the Central Heating Plant could not be shut down at the same time, but plaintiff’s representative did not so understand.
8. Both plaintiff and Welker & Diehl prepared bids for the rehabilitation of the Central Heating Plant. Welker & Diehl based the preparation of its bid on Welker’s infor *337 mation that they would be permitted to work on only one boiler at a time, and that two boilers would at all times be in operation. Plaintiff prepared its bid in good faith upon the assumption that all three boilers of the Central Heating Plant would be shut down during the anticipated mild temperatures in the next 60 days; that the small steam load necessary from the boiler that was in operation during the early September inspection could be taken care of by the small boilers located on the charge or production lines; and that the whole boiler rehabilitation work would be completed before colder weather would require resumption of the simultaneous operation of all three boilers.
9. The specifications with respect to repair of the stokers were not entirely clear to plaintiff, and, following a conference, the prime contractor, Whittenberg, issued an addendum listing certain changes. No mention was made in the addendum of a shutdown of all three stokers at the same time for purposes of expediting the repair work to be accomplished.
10. Plaintiff’s bid was submitted under date of September 23, 1952, and was for the lump sum price of $27,963, with the unit price for all tubes to be installed $64.35 each, plus $15 baffle repair for each tube. Plaintiff’s bid contained a provision that the rehabilitation work would be completed within 45 days after delivery to it of the necessary pumps. The specifications called for seven pumps.
11. Welker & Diehl’s bid was submitted September 24, 1952, and was for the lump sum price of $68,340, with unit prices for tubes to be installed ranging from $180 to $300. Welker & Diehl’s bid contained a provision that the work would be completed within 180 calendar days.
12. Neither plaintiff’s bid nor Welker & Diehl’s bid made any reference to a shutdown of the Central Heating Plant during performance of the rehabilitation work required.
13. There were only two bids. At the opening of the bids, in the presence of the two bidders, plaintiff was asked by the architect-engineer, Mr. Luhan, to review its bid on account of the low amount thereof, particularly in comparison with the bid of Welker & Diehl, and to present its bid work sheets to assure the correctness of the bid. Streeter *338 returned to the Central Heating Plant to ascertain if a mistake had been made. After the review he reaffirmed plaintiff’s bid, but did not present the work papers and did not advise defendant that plaintiff was assuming that the Central Heating Plant would be completely shut down or that it was planned to complete the boiler repair work prior to the beginning of cold weather.
14. Whittenberg notified plaintiff of the award on September 26, 1952, and advised plaintiff that it could proceed with the work. Plaintiff immediately placed some orders for steel and other items. The award to plaintiff resulted in construction subcontract No. 72 between plaintiff and Whittenberg, dated September 30, 1952, signed on behalf of plaintiff December 17,1952.
15. The subcontract provided that plaintiff furnish all plant labor, materials, and equipment, and perform all operations necessary for the rehabilitation of the boilers in Item 51, Central Heating Plant, in accordance with plans and specifications, and that the work be completed 45 days after receipt of pumps, as specified.
Article II of the subcontract provided that plaintiff bound itself to the prime contractor, Whittenberg, and to the Government, to comply fully with all undertakings and obligations of Whittenberg as set forth in the prime contract, of which plaintiff had a copy.
Article VII provided as follows:
All dispute [sic] concerning questions of fact arising under this subcontract shall be decided by the contracting officer, whose decision shall be in writing, subject to approval of either party hereto within 30 days from the receipt of the contracting officer’s decision to the Chief of Engineers whose decision shall be final and conclusive upon the parties hereto. Notwithstanding this provision, the subcontractor shall diligently proceed with the work as directed.
Article X provided as follows:
The subcontractor shall fully cooperate with other contractors or subcontractors engaged on Government work at the locality covered by the principal contract and shall not interfere with the performance of their work. In case of conflict which cannot be adjusted by *339 the contractor the necessary coordination shall be as directed by the contracting officer.
Article XVII provided as follows:
Subject to the approval of the Contracting Officer, the contractor may by a written order change the extent of or amount of the work covered by this subcontract. If any such change causes a material increase or decrease in the amount or character of such work, an equitable adjustment shall be made, and this subcontract shall be modified in writing accordingly. If the subcontractor and the contractor fail to agree upon an equitable adjustment of the amount of the additions or deductions, hereunder, the dispute shall be determined as provided in Article VII.
The specifications for the boiler rehabilitation were annexed to the subcontract and entitled “Specifications,” Section 2, “Boilers,” as amended by Addendum I. These specifications provided:
The Subcontractor shall submit a complete schedule of the materials proposed to be used for the reconditioning of the boilers to the Contracting Officer for approval before commencement of the work and the installation of any materials.
The specifications annexed to the subcontract with respect to rehabilitation of auxiliary equipment controls and piping, entitled “Specifications,” Section 3, “Auxiliary Equipment Controls and Piping,” as amended by Addendum I, provided:
As soon as practicable and within 30 days after the date of award of contract and before commencement of installation of any materials or equipment, a complete schedule of materials and equipment proposed for installation shall be submitted for approval of the Contracting Officer. The schedule shall include catalogs, cuts, diagrams, drawings and other such descriptive data as may be required by the Contracting Officer. In the even [sic] that any items of material or equipment contained in the schedule fail to comply with the specification requirements, such items may be rejected.
16. All of the provisions and specifications of the contract were prepared by the defendant. Although the contract does not state specifically that there will be a complete shutdown of all three boilers while the work required is being *340 accomplished, it is plaintiff’s contention that it is customary in the trade, in the absence of a contract provision to the contrary, for the type of work required by the contract to be performed while the complete unit is in a shutdown condition. Under a contract where work is to be performed in phases, or in a certain sequence, such requirement is usually set out in the contract or the specificatons.
17. Building 2541, containing the Central Heating Plant, was located in the area of the Hoosier Unit, between the buildings of the Inert Storage Area and the buildings of the Administrative Area. It contained three large boilers, their stokers, valves, headers, and feed and other pipes, and what was known as a water softener unit, supplying steam heat through high pressure steam mains to all of the buildings in the Administrative and Inert Storage Areas. The boilers had a combined capacity of 75,000 pounds of steam per hour, the heat being regulated according to outside temperatures. They were built so that each boiler could be shut down and isolated from the others in operation, and workmen could safely work in the isolated boiler.
18. According to the testimony in behalf of plaintiff’s firm, which had performed work of this type for many years, the normal and customary method of procedure in performing the work required by the contract involved here would be to mobilize the necessary equipment and personnel, including a general supervisor or foreman and various crews of workmen of the different crafts.[13] Generally approximately nine different crafts are used in performing this type of contract. These include boilermakers, ironworkers, steamfitters, brickmasons, etc. The entire equipment to be rehabilitated is dismantled in order to ascertain the exact requirements of materials so that they may be ordered and coordinated into the work schedule and permit the effective use of the various craft crews without shuttling them back and forth between jobs. The specifications for Item 51 of the contract (quoted above) suggest the use of such *341 standard procedure, since the submission “* * * before commencement of any installation of any materials * * * [of] a complete schedule of materials * * * for approval of the Contracting Officer * * *” was required. A strict and complete compliance with this requirement would necessarily require the shutdown of the plant and dismantlement of all three boilers.[14]
19. On September 26,1952, plaintiff received verbal orders to proceed with the work, and immediate action was taken to mobilize the necessary men, material, and equipment at the site of the work. Shortly after commencing performance of the work under the contract and throughout the contract period, extra work was ordered and subsequently included in eight supplemental agreements. Plaintiff was advised by representatives of defendant that it would be required to maintain one boiler in full operation at all times and that plaintiff would not be permitted to perform the contract with the Central Heating Plant in a completely shutdown condition. Starting some time between December 1 and 10, 1952, and thereafter, throughout the performance of the contract, plaintiff made repeated requests that the Central Heating Plant be shut down in order that the plaintiff might properly schedule the necessary work in what plaintiff considered to be a customary and orderly manner. A number of formal meetings were held by the parties at which this matter was discussed.
20. Generally, from late spring to early fall, the Central Heating Plant was shut down for overhauling, one boiler at a time. The only building then requiring heat and hot water was the cafeteria, in the Administrative building. It was supplied by two small boilers in a shack known as TC-38 except in the summers of 1952-1953, when a boiler in the Central Heating Plant was kept in operation.
The TC-38 boilers, known as a “package unit,” had a capacity of only 4,140 pounds of steam per hour. Besides the Central Heating Plant, there were no other heating plants or boilers with which to heat any of the buildings in the Administrative and Inert Storage Areas, and there were no *342 connections or mains with, which such buildings could be heated from any other source, such as the loading lines, with their small boilers, and the powerhouse unit in Plant 2.
21. In September 1952 and thereafter, Hoosier Ordnance Plant was manufacturing, producing, and transporting, for the use of the United States, particularly during the Korean hostilities, ammunition consisting of propellant charges composed of smokeless, black base and double base powder, and in manufacturing the bags into which the powder was loaded. Until September 1952 it was a two-shift job of eight hours each, from 1:00 o’clock until around midnight, and then a three-shift job around the clock. The reason for this acceleration was the extreme urgency in obtaining ammunition, beginning at that time and becoming very acute in 1953. The Hoosier Unit played a vital part in supplying the United States troops with ammunition, and it could not stand a complete shutdown of the Central Heating Plant, particularly from September 1952 through March 1953, unless a substitute source of steam could be obtained.
22. When the plaintiff received oral notice to proceed September 26,1952, with rehabilitation of the Central Heating Plant, one boiler was completely shut down for rehabilitation, one was about to resume or had resumed operating after being down for the summer months, and one was, as it had been that summer, in full operation.
23. Plaintiff did some work prior to October 22, 1952. This first work, not specified in the contract, was extra work in connection with the tearing down and replacement of the brickwork in the pit or ash hopper of one of the boilers.
24. Plaintiff did not request a complete shutdown until a date between December 1 and December 10, 1952. Plaintiff was told by the architect-engineer Mr. Luhan and by Mr. Page, the Corps of Engineers representative, that the approval of Goodyear, the operating contractor, would have to be obtained before the shutdown could be accomplished. Mr. Luhan said he would call a meeting of all concerned to see what could be done about a shutdown.
25. In the rehabilitation work performed at Boiler No. 1, plaintiff, without proper authorization, replaced the coal chutes with 8" pipe instead of the standard 12" seamless steam pipe as specified. On October 30, 1952, following in *343 spection of that work, the architect-engineer directed plaintiff to take out the 8" pipe and install the standard seamless steam pipe as specified.
26. In November 1952, plaintiff removed the boiler tubes from Boiler No. 1 and installed new tubes, but did not properly seal them, with the result that after they were filled with water, and on December 15, 1952, the tubes were found to be leaking. The record does not disclose the amount of time required to empty the tubes and seal them so that there would be no leakage.
27. On November 19, 1952, when the replacement plates for the smokestacks for all three boilers, purchased on plaintiff’s order, arrived, they were found to be 14" thick instead of the y8" thick plate specified. The delay ensuing between the rejection of the plate and the arrival and installation of the specified y8" plate was chargeable to plaintiff.
28. On December 18, 1952, a meeting of the persons interested in plaintiff’s performance of its subcontract was held. It was attended by representatives of plaintiff and the prime contractor Whittenberg; by architect-engineer Luhan; by the Goodyear engineer supervising the Central Heating Plant, Mr. McDaniel; and by representatives of the Corps of Engineers, including Mr. Page. As stated by architect-engineer Luhan, who organized the meeting, it was called to see what kind of schedule could be worked out with respect to the shutdown of the Central Heating Plant. There were, in all, 31 items listed in the specifications for reconditioning and rehabilitation on which no work had been done except with respect to Boiler No. 1, on which substantial work had been done. It was the consensus of opinion of those present that, of a total of 31 items requiring reconditioning, etc., a complete shutdown of the boiler plant would only be required for work on six items, as follows:
1. Becondition chemical pump (soda-ash water) float control, Bdlk gear drive “Endec”, #W013X1C. Beplace parts as required.
8. Becondition heater tank float valves for condensate, filter and make-up water pumps. Beplace parts if required. Check same for proper operation.
17. Becondition and rehabilitate the Cochrane Co. water softening systems including water softner, heater *344 and flash, tank. Test for proper operation and replace parts as required.
23. Eecondition, test and calibrate steam pressure gages (3). Babcock & Wilcox, range 0-300 p.s.i., bronze tube type #1077A.
29. Eecondition all piping and replace insulation as required.
31. Eemove present check valves and furnish and install three (3) new check valves and three (3) new 3" gate valves for feed water pumps.
Plaintiff stated that except for the pumps, which had not yet been delivered, the work on all 31 items could be accomplished in 45 days after a complete shutdown of the plant, and that the pumps could be installed after the other work was accomplished. Government engineer Page suggested that an auxiliary heating plant be installed for the period of 45 days. Goodyear Engineer McDaniel pointed out that such auxiliary plant would have to supply a million and a half pounds of steam a day. The architect-engineer, Mr. Luhan, was not opposed to a shutdown provided an auxiliary heating plant could be installed. Plaintiff stated that its schedule of delivery for the pumps was 150 days from the time of bidding, September 23, 1952, and that, upon confirmation with the pump manufacturing company of the delivery date, which would be the last week in February 1953, it might be possible to have the other work, not requiring a shutdown, completed by February 20 or March 1,1953, leaving the ensuing 45 days for installation of the pumps and completion of the whole of the work. No change order or memorandum agreement was entered into as a result of this meeting and nothing in writing ensued except the typewritten report of the meeting, a copy of which is in evidence as Joint Exhibit 6.
29. During the first week in January 1953 plaintiff pulled all of its workmen off the job at the Central Heating Plant and sent them back to Indianapolis, Indiana. Plaintiff claimed a violation of the subcontract on the part of the prime contractor in preventing plaintiff from purchasing and receiving a mark-up or profit margin, on parts necessary for stoker repairs. Plaintiff then asked the prime contractor for a meeting with all concerned. A meeting was held on January 13, 1953, at which, as in the case of the *345 December 18, 1952, meeting, the statements of the various parties were taken by a stenographer and transcribed in typewritten form. At this second meeting were plaintiff’s lawyer, Mr. Kothe; a representative of the surety company on plaintiff’s performance bond; and the contracting officer’s representative, Major Antonelli.
It appears that as a result of a prior conference between plaintiff’s head engineer, Mr. Templeton; the prime contractor’s representative, Mr. Reeeveur; Mr. Page of the Corps of Engineers; and Mr. Luhan, the architect-engineer, plaintiff “understood” it was determined that, as soon as a complete list of stoker parts was prepared, a work order would be issued for plaintiff to purchase the needed parts. Plaintiff contacted the stoker parts manufacturer for parts and prices. Shortly thereafter, plaintiff was informed that the prime contractor was purchasing the parts, and had indeed already purchased them. Plaintiff, regarding this a violation of the subcontract under which it considered itself entitled to mark-ups, or profit margins, on purchases of repair parts needed, stopped all work and sent its men back to Indianapolis.
30. Subsequently, but on what date the record does not disclose, plaintiff called its men back to work at the Central Heating Plant. Plaintiff did not pursue its initial claim that a violation of the subcontract was involved to its damage, nor has such a violation been included as a part of its present claim. The delay involved in stopping the work, and sending plaintiff’s men to Indianapolis and returning them again, resulted in a delay in plaintiff’s work progress of about a week, i.e., from January 8 to 14, 1953.
31. On or about March 7, 1953, a locomotive furnished by defendant was installed by plaintiff on a track siding, to serve as a boiler for an auxiliary heating plant and furnish the Central Heating Plant in a shutdown condition as agreed upon at the meeting of December 18, 1952, at which meeting the “target date” for completion of the work on the plant had been determined to be the first of March 1953. The locomotive, in its stationary position at the side of Building 2541, Central Heating Plant, connected during a weekend shutdown to the manifold header of the plant, did *346 not and could not produce any appreciable volume of steam or pressure, and its use was discontinued on the first day of its operation. No change order, supplemental agreement, or modification of the subcontract was made or executed relating to the installation and use of the locomotive as an auxiliary heating plant.
32. On or about March 5, 1953, plaintiff received delivery at the job site of six of the seven pumps ordered. It never received the seventh pump, which apparently was designated for use in connection with the water softening system. Since, due to the total failure of the locomotive to serve as an auxiliary heating plant, the Central Heating Plant could not be and was not completely shut down on account of the current cold weather, and since there was no pump for it, it was agreed by plaintiff, the prime contractor, and defendant to delete from the subcontract the item for the reconditioning of the water softener system. The prime contractor and defendant substituted another type of water softening system, known as the Culligan System, which did not necessitate a shutdown of the plant and which had good effect on the boilers.
33. The average mean temperatures for the United States Weather Bureau, Louisville District, embracing the Hoosier Ordnance Plant, during the fall, winter, and early spring of 1952-53 were as follows:
Degrees
September 1952_55
October 1952_38.6
November 1952_37.2
December 1952_33
January 1953- 32.8
February 1953_31.3
March 1953_40. 5
April 1953_45. 5
34.On May k6, 1953, the prime contractor, at plaintiff’s request, called a meeting of the representatives of plaintiff, including its lawyer, Mr. Kothe, the prime contractor, the architect-engineers, and the Corps of Engineers. Mr. Kothe called attention to the necessity of a complete shutdown of the Central Heating Plant “at the time of delivery of the pumps,” which delivery had finally been effected on March *347 5, 1953, except for the one pump referred to above. He also referred to the failure of the locomotive as an auxiliary heating plant, which made it necessary to work on one boiler at a time, with an insufficient flow of work, and delays, which increased plaintiff’s loss. He then stated that plaintiff “recognized the fact that this situation was not contemplated, nor is it the fault of anyone. They had had the full cooperation of everyone.”
Mr. Templeton, plaintiff’s engineer, then proceeded to describe a difference in costs to plaintiff with all three boilers shut down as compared with having only one boiler shut down. In doing so, he indicated that the subcontract was then 70 percent completed, but that costs were currently going up. Plaintiff further stated that they were faced with a prospective wage rate increase in several of the crafts. Plaintiff’s lawyer, Mr. Kothe, proposed that “consideration [be] given to the possibility of entering into a supplemental contract,” but could not give a statement of the losses at that time.
Defendant declined to enter into a supplemental contract and advised plaintiff to complete the work and any claim it had for losses or increased costs under the contract should then be submitted to the contracting officer.
35. During plaintiff’s performance of the subcontract, particularly from the first part of January 1953 through September 1953, plaintiff and prime contractor Whitten-berg, with the approval of defendant, entered into eight supplemental agreements and numbered modifications of the subcontract with respect to work, material, equipment, and prices. But, during this period there apparently was no reference to a shutdown of the three boilers in the Central Heating Plant. Plaintiff presented its claim to the prime contractor at a meeting on September 23, 1953. The claim was in the amount of $105,931.16. It did not specifically itemize any increased costs which may have resulted from having to work on one boiler at a time at the Central Heating Plant.
36. At the meeting of September 23, 1953, Mr. Page, representing the contracting officer, presented to plaintiff for signature Modification No. 8 as the final supplemental agree- *348 mexit for work over and above that contemplated at the time of award of subcontract. This modification covered work and materials on work orders since J anuary 6,1953, as well as certain extra work performed between April 1 and July 31,1953; the modification also was “for the purpose of covering the remainder of the work.” The total amount of such work and materials made in addition to the subcontract was $28,837.21. From this amount there was deducted $76.86 due to a mathematical error in a previous work order, $502 for deletion from the contract of the water softener reconditioning, and $1,309.17 for the pump that was to have been used in the water softener system but never was delivered to plaintiff by its manufacturer. The final balance, which by Modification No. 8 the prime contractor and defendant agreed should be paid plaintiff, was $26,949.18.
Under date of October 12, 1953, the supplemental agreement, Modification No. 8, was signed by the prime contractor, plaintiff and its surety, and the defendant.
37. When plaintiff commenced work under the subcontract, the Central Heating Plant was not completely shut down and two of the three boilers were then, and until May 6, 1953, continuously in operation. Thereafter, the Central Heating Plant was completely shut down for the usual summer overhauling of one boiler at a time.
38. Plaintiff did not complete performance of the subcontract as supplemented and modified until the latter part of November 1953. Plaintiff’s proof does not establish in detail specific reasons for taking from the first part of May until the end of November 1953 to complete the last 30 percent of the work involved. It is obvious that the failure to shut down all three boilers at the same time, taken by itself, contributed materially to the length of time required to complete the job and that performance of the contract in a piecemeal fashion increased both the time element and the cost of performance. With a complete shutdown of all three boilers, plaintiff should have been able to complete the job in approximately 45 days after the delivery of all necessary parts.
39. Under date of December 3,1953, plaintiff filed a claim in the sum of $52,798.90 with the prime contractor, Whitten- *349 berg. This was stated to be in addition to the sum of $119,-417.37 previously paid to the subcontractor, but it did not include $250 which had been withheld by defendant to keep the contract open. Under date of July 23, 1954, in order to process plaintiff’s claim, defendant accepted the assignment by the prime contractor of the subcontract made with plaintiff in this action.
40. On June 11, 1956, the contracting officer made the following findings of fact:
FINDINGS OE PACT
To support decision of the Contracting Officer denying claim for additional compensation by W. H. Edwards Engineering Corporation, Contract No. DA-15029eng-5322
1. Contract No. DA-15-029eng-5322, dated 30 September 1952, was originally entered into between Whit-tenberg Construction Co. and W. H. Edwards Engineering Corp. as subcontract No. 72 under Cost-Plus-Fixed-Fee Contract No. DA-15-029eng-2121 between the United States of America and Whittenberg Construction Co. The subcontract work was performed and physically completed on 16 November 1953 as subcontract No. 72, and for the purpose of consideration of Edward’s claim for additional compensation was assigned to the Government on 23 July 1954 and re-numbered as DA-15-029eng-5322.
2. The W. H. Edwards Engineering Corp. (hereinafter referred to as “Edwards”) has presented a claim for additional compensation in the amount of $52,798.90 (which includes $250.00 admittedly due Edwards) for additional costs incurred in the performance of the work.
3. The subcontract provides for the rehabilitation of the boilers in Item 51, Central Heating Plant. There are 3 boilers in the Heating Plant. It is Edwards’ contention that the plant was to be shut down completely, in order that the work could be performed on all boilers at the same time; and not that work was to be performed on each boiler in succession, with 2 remaining in service at all times. Edwards contends that the method by which he was required to perform the work caused him additional costs and expense as stated above.
4. Hoosier Ordnance Plant is operated for the Government by Goodyear Engineering Corporation under *350 Contract No. DA-11-173-OBD-98 dated 16 April 1951. Prior to that time the plant was being operated by the Ordnance Corps. The general plan for rehabilitation of the plant was that when Ordnance personnel completed a batch in a particular line, the line was de-acti-vated and then rehabilitated by Whittenberg. When the line was rehabilitated, Goodyear took over the operation of the line. This operation was repeated until Goodyear was operating the entire plant.
5. Edwards also performed Subcontract No. 8, dated 9 May 1951, between Whittenberg and Edwards which covered work at the same project. The subcontract was in the estimated amount of $70,691.24 plus work to be performed at unit prices. Work on this subcontract was performed between May and December 1951. The work covered by the Subcontract No. 8 included rehabilitation of the heating facilities in some of the lines noted in paragraph 4 above. From his performance of work on the project under Subcontract No. 8, Edwards was aware of the general nature and importance of operations in progress at the project.
6. Subcontract No. 72 between Whittenberg and Edwards, now Contract No. DA-15-029eng-5322, is dated 30 September 1952 and basically required the rehabilitation of the boiler plant serving the Administration area, bag manufacturing building and laundry, producing steam for heating purposes and some for equipment.
7. Provisions of the Edwards subcontract pertinent to the claim are as follows:
a. Article 1(b)
“The subcontractor shall furnish under the general supervision of the contractor the labor, materials, tools, machinery, equipment, facilities, supplies and services not furnished by the contractor or the Government and do all things necessary for the construction and completion of the following work: Furnish all plant labor, and materials, and equipment and perform all operations necessary for the rehabilitation of Boilers in Item 51, Central Heating Plant, in accordance with plans and Specifications as issued by Hazelet & Erdal, Clarification of Bid Form dated Sept. 19, 1952 and Addendum No. 1 dated 22 September 1952. Sections 4 and 5 of the specifications are not included in this subcontract. Electrical work to be included in this subcontract will include only the disconnecting and connecting motors and electrical instruments, etc. Paragraph 2-05, Page 2-2 of the Specifications shall be accomplished as set *351 out in copy of letter to Edwards Engineering Corporation from Dowell, Inc. (copy attached hereto and made a part hereof)
b. Article II
“In the performance of this subcontract, the subcontractor binds himself to the Contractor and to. the Government to comply fully with all the undertakings and obligations of the contractor, excepting such as do not apply to the subcontractor’s work, as are set forth in the Principal Contract No. DA-15-029eng-2121, a copy thereof having been furnished the subcontractor, which is hereby adopted and made a part of the subcontract. Additional copies of the principal contract are on file in the offices of the Contracting Officer and the Chief of Engineers.”
c. Article V(a)
“In consideration of the subcontractor’s undertaking hereunder, the subcontractor shall receive the sum of Twenty-seven Thousand, Nine Hundred, Sixty-three and no/'100 dollars ($87,963.00).
For the purpose of increase or deduction of replacement of Tubes set out in Paragraph 2-04 of the specifications :

Sadi

High Duty Furnace Wall Tubes-$64 35
Front Wall Tube_ 64.35
Baffle WaU Tube_ 64.35
Side WaU Tube_ 64.35
Baffle Repair_ 15.00
which shall constitute full compensation for the performance by the subcontractor of the work and services authorized herein. In the event the Government exercises any of its reserved rights under the principal contract hereinbefore referred to and to which this subcontract is made subject, an equitable adjustment shall be made in the amount due under this subcontract in accordance with Article XVI hereof.”
d. Article VII
“All disputes concerning questions of fact arising under this subcontract shall be decided by the Contracting Officer, whose decision shall be in writing, subject to approval of either party hereto within 30 days from the receipt of the Contracting Officer’s decision to the Chief of Engineers whose decision shall be final and conclusive upon the parties hereto. Notwithstanding this provision, the subcontractor shall diligently proceed with the work as directed.”
e. Article X
“The subcontractor shall fully cooperate with other *352 contractors or subcontractors engaged on Government work at the locality covered by the principal contract and shall not interfere with the performance, of their work. In case of conflict which cannot be adjusted by the contractor the necessary coordination shall be as directed by the Contracting Officer.”
f. Article XVII
“Subject to the approval of the Contracting Officer, the contractor may by a written order change the extent of or amount of the work covered by this subcontract. If any such change causes a material increase or decrease in the amount or character of such work, an equitable adjustment shall be made, and this subcontract shall be modified in writing accordingly. If the subcontractor and the contractor fail to agree upon an equitable adjustment of the amount of the additions or deductions, hereunder, the dispute shall be determined as provided in Article VII.”
8. Edwards submitted a claim under date of 3 December 1953, which is attached as Exhibit A and contains statement of the amount requested, $52,198.90; statement of facts; and a number of letters and trans-scripts of conferences. It will be noted that certain additions to and deletions from the transcript records have been made by Edwards. These changes are noted at the appropriate place in the copy attached.
9. At the request of Edwards, the Contracting Officer caused a hearing to be held in order to fully determine the facts of the dispute, at which Edwards and Whitten-berg presented testimony, records, and other evidence to support their respective contentions. Transcript of such hearing (which extended over three sessions) is incorporated herein by reference.
10. By letter of 11 April 1956 (Exhibit B), Edwards’ attorney forwarded a proposed findings of fact. It will be noted that the amount claimed therein is stated as $51,239.55 plus the $250.00 admittedly due the contractor.
11. The subject subcontract was awarded to Edwards by Whittenberg as a result of competitive bidding. Invitations to bid (Exhibit C) were issued to 7 prospective bidders, who were also invited to inspect the site of the work. Representatives of Edwards, Welker & Diehl and Hempfling Engineering Company did inspect the heating plant and received answers to some questions. It is controversial as to whether any information was requested or given concerning shutting down the plant, but there is no clear evidence that *353 Edwards was actually informed that the plant could not be shut down. There was also no statement made that the plant could be shut down. Two bids were received, from Edwards ($27,963.00) and Welker & Diehl ($68,340.00). Because of the discrepancy in bids, Edwards was asked to and did confirm his bid price, and was thereafter awarded the subcontract. No question concerning shutting down the plant was raised at that time.
12. During the progress of the work, Edwards repeatedly stated that his work could not be performed without shutting down the plant, and was informed that tivo of the three boilers must be kept in operation at all times, in order that operations could continue. Numerous efforts were made to devise means of furnishing steam without using the boiler plant, including connection of a locomotive to the steam lines, but none were successful and arrangements were made to shut down the boiler plant on week-ends, in order to permit performance of portions of the work. Edwards’ entire force on the project was kept employed in the performance of work under change orders, which work could be performed while the plant was in operation, and the total amount of which change order work amounted to $93,515.54; as compared to the original contract amount of $27,963.00.
13. During the hearings conducted by the Contracting Officer, it was developed that the amount of claim for additional payment was computed by Edwards by subtracting the amount received from change order work from his total costs, to determine his alleged cost of performing the work under the original contract; and then subtracting the amount received for other than change order work from such alleged cost, to determine his alleged excess costs due to the failure to make the entire plant available for his work, which is the basis of his claim herein. Although Edwards was urged during the course of such hearings to present any detailed records of costs which he claimed were directly due to the conditions of which he complains, he has submitted no such records. The amount of $250.00 has been retained from amounts otherwise due Edwards to hold the contract open pending final determination of his claim and this amount is admittedly due and owing to Edwards.
Findings :
From the foregoing facts I find that neither the Invitation for Bids nor the subcontract under which *354 this work was performed contained any statement that the boiler plant would be shut down to permit, the performance of the work, that the bid submitted by Edwards contained no provision or condition to this effect; that by reason of his previous work on Hoosier Ordnance Plant, under Subcontract 8, Edwards was or should have been familiar with the fact that Hoosier Ordnance Plant was engaged in urgent defense production and that continuous operation of the boiler plant was essential to such production; that the failure to make the entire plant available to Edwards at one time, in shut-down condition, did not constitute a changed condition which would entitle Edwards to additional payment; that the method by which Edwards has computed his claim amount is not a true measure of costs due to the conditions of which he complains, but is conjectural and disregards any errors which may have oc-cured in his original contract price or the price for change order work and any costs which may have been incurred for other reasons during the performance of the work; and that there are no provisions of the contract providing payment for the causes set forth by the contractor.
I therefore find that this claim of W. H. Edwards Engineering Corporation as presented should be denied except as to the $250.00 which has been retained pending final determination of his claim.
41. Under date of June 19, 1956, plaintiff filed an appeal from the decision of the contracting officer to the Chief of Engineers, Department of the Army.
On December 9, 1957, plaintiff’s appeal was presented to the Corps of Engineers Claims and Appeals Board. Both plaintiff and defendant were represented by counsel. Three witnesses testified on behalf of plaintiff. The testimony of Whittenberg, called as a witness on behalf of defendant, was dispensed with, and defendant rested on the record before the contracting officer.
42. On April 29,1958, the Corps of Engineers Claims and Appeals Board announced its decision of plaintiff’s appeal as follows:[15]
*355 The appellant asks extra compensation for a change in the “order of work”, pursuant to Article XVII which authorized adjustments only for written orders changing “* * * the extent of or amount of the work covered by this subcontract.”
However, the “order of work” is not provided for in this subcontract, and the parties have so stipulated (Findings 1). The stipulation is [in]consistent with the appellant’s charge that performance was subjected to conditions, “* * * contrary to and beyond any of the provisions of said subcontract” (Claim, p. 5). Further, m point of fact, Edwards testified that he performed no work “* * * not covered by either the contract or modifications * * *” (Findings 11).
We must conclude that appellant is attempting to invoke a contractual remedy which by its terms, by admission and by stipulation is patently inapplicable in the premises.
We further conclude from the evidence of record that appellant seeks to recover costs of delays and other expenses which are wholly unrelated to the issues of boiler repair while in shut-down conditions, e.g., withdrawal of work forces to Indianapolis when not allowed to charge the mark-up on extra items of materials, several weeks of delay near the beginning of the work on ordering of materials, tardiness of decisions, appellant’s errors in procurement of the seventh pump and thickness of the water softener stack plate.
All causes and costs of delay prior to 5 March 1953 would have to be disregarded since appellant’s period of performance was not to commence until delivery of the pumps, which was not scheduled until March, and which were in fact not delivered (6 of I) until 5 March. Further, all delays and costs due to appellant’s own fault or negligence, or which are properly for inclusion in the eight supplemental agreements to the subcontract, would, in any event, be for disallowance.
However, any residue of damages for delays after 5 March 1953, or aside from those occurring due to appellant’s own errors, or comprehended by the accepted modifications to the subcontract, must also be disallowed because there is no provision in the contract authorizing monetary adjustments for costs of delays. The standard form of construction contract contains a “suspension of work” clause, pursuant to which delay costs wrongfully caused by the Government may be contractually adjusted. Here, there is no comparable administrative *356 mechanism whereby damages for delays may be compensated, and the executive agencies of Government are without jurisdiction to settle claims for unliquidated damages absent such a provision. Wm. Cramp & Sons v. United States, 216 U.S. 494; Cont. Ill. Nat. Bank v. United States, 126 C. Cls. 631.
For want of jurisdiction the appeal is dismissed with the foregoing special findings.
CONCLUSION OB LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Eule 38(c).

 Shortly after commencement of wort: on the subcontract, and from time to time 'thereafter, extra work was ordered and subsequently included in eight supplemental agreements.

 The seventh pump, which was to be used in the water softening system, was never received. Since reconditioning of this system would have required the complete shut-down of the heating plant, which defendant would not permit after efforts to establish alternative sources of steam had failed, and since there was no pump for it, the item calling for rehabilitation of the water softener was deleted from the contract; another type of water softener was substituted.

 Article XVII:
“Subject to the approval of the Contracting Officer, the contractor may by a written order change the extent of or amount of the work covered by this subcontract. If any such change causes a material increase or decrease in the amount or character of such work, an equitable adjustment shall be made, and this subcontract shall be modified in writing accordingly. If the subcontractor and the contractor fail to agree upon an equitable adjustment of the amount of the additions or deletions, hereunder, the dispute shall be determined as provided in Article VII.”
Article VII provided as follows:
“All dispute concerning questions of fact arising under this subcontract shall be decided by the contracting officer, whose decision shall be in writing, subject to approval [appeal] of either party hereto within 30 days from the receipt of the contracting officer’s decision to the Chief of Engineers whose decision shall be final and conclusive upon the parties hereto. Notwithstanding this provision, the subcontractor shall diligently proceed with the work as directed.”

 The appellate board also held that It lacked jurisdiction to consider a monetary adjustment for costs attributable to delays caused by the Government, as the standard “suspension of work” clause authorizing the settlement of claims for unliquidated damages by the executive agency was not included in this subcontract. Wm. Cramp & Sons v. United States, 216 U.S. 494 (1910) ; Continental Illinois National Bank v. United States, 126 Ct. Cl. 631, 640, 115 F. Supp. 892, 897 (1953).

 The issue at bar, involving solely the construction of the subcontract terms, is to be distinguished from questions involving the application of undisputed contract provisions to external objects, such as the problems discussed in River Construction Corp. v. United States, 159 Ct. Cl. 254, 262-65 (1962).

 The record of the administrative evidence was admitted into evidence at the trial in this court.

 The Trial Commissioner, reporting a meeting held on December 18, 1952, to see what kind of schedule could be -worked out with respect to a shut-down of the central heating plant, included the following in Finding 28, to which no exception has been taken: “Plaintiff stated that except for the pumps, which had not yet been delivered, the work on all 31 items [the items remaining to be completed] could be accomplished in 45 days after a complete shut-down of the plant, and that the pumps could be installed after the other work was accomplished.”

 If the defendant were right on this point, the same discrepancy should have compelled the Government to conclude that the plaintiff had necessarily made a fundamental error.

 Such as the use of steam from a production-line boiler to heat the area usually served by the central heating plant, or a movable steam-plant like that tried unsuccessfully in March 1953.

 There were also some other work-requirements which would require a full shut-down. See finding 28.

 See A.L.I., Restatement of the Law of Contracts, Sec. 230 (“Standard of Interpretation Where There Is Integration”), Comment a: “* * * The objective viewpoint of a third person Is taken. * * *; Gaunt v. John Hancock Mut. Life Ins. Co., 160 F. 2d 599, 601 (C.A. 2, 1947), cert. denied, 331 U.S. 849.

 under its contract, plaintiff was not required to appeal to the Secretary Of the Army from the adverse decision of the'representative of the Chief of Engineers (the Claims and Appeals Board).

 The proof as to this matter is conflicting and lacking in conclusive evidence from either side. Defendant's proof Is to the effect that in the case of a manufacturer’s heating plant with more than one boiler needing repair or rehabilitation it is customary practice in the engineering trade to shut down only one boiler at a time.

 The exact nature and extent of the repairs to be made was not known by the parties at the time the contract was executed.

 The findings of the Corps of Engineers Claims and Appeals Board, not quoted here, are in evidence as Joint Exhibit 19.